[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 15, 2010
JOHN LEY
CLERK

_____

No. 09-14194

_____

D. C. Docket No. 08-21747-CV-UU

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,
a federally-recognized Indian Tribe,

Plaintiff-Appellant,

versus

UNITED STATES ARMY CORPS OF ENGINEERS,
SECRETARY OF THE ARMY,
John M. McHugh, in his official capacity,
LT. GEN. ROBERT L. VAN ANTWERP,
Chief of Engineers, U.S. Army Corps of
Engineers, in his official capacity,
BG. GENERAL JOSEPH SCHROEDEL,
Division Engineer, South Atlantic Division
Corps of Engineers, in his official capacity,
PAUL L. GROSSKRUGER,
District Engineer, Jacksonville District,
Corps of Engineers, in his official capacity,
UNITED STATES OF AMERICA,

Defendants-Appellees,

SOUTH FLORIDA WATER MANAGEMENT DISTRICT,

Intervenor-Appellee.

D. C. Docket No. 08-22966-CV-PAS

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,
a federally-recognized Indian Tribe,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA,
U.S. ARMY CORPS OF ENGINEERS,
SECRETARY OF THE ARMY,
John M. McHugh, in his official capacity,
CHIEF OF ENGINEERS, U.S. ARMY CORPS
OF ENGINEERS,
Lt. General Robert Van Antwerp in his
official capacity,
DIVISION ENGINEER, SOUTH ATLANTIC
DIVISION CORPS OF ENGINEERS,
Bg. General Joseph Schroedel, in his
official capacity, et al.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(September 15, 2010)

Before BLACK, WILSON and MARTIN, Circuit Judges.

WILSON, Circuit Judge:

The Miccosukee Tribe of Indians of Florida (the Tribe) filed two lawsuits challenging the federal government's plans to replace a mile of the ground-level Tamiami Trail (U.S. Highway 41) with a bridge, to increase the flow of water into Everglades National Park. The district courts dismissed the Tribe's claims for lack of subject matter jurisdiction, and we have consolidated the Tribe's appeals of those decisions. The district courts concluded that language Congress inserted in a spending bill partially repealed the environmental laws that the Tribe was invoking. The Tribe challenges that interpretation, and asserts the rulings violate the Constitution on several counts. For the following reasons, we conclude that the act of Congress deprived the federal courts of subject matter jurisdiction over the Tribe's claims. Therefore, we affirm the judgments of the district courts.

## I. Background

*a. Historical Backdrop of the Litigation*[1]

The Miccosukee Indians have long resided in the Everglades.[2] The

---

[1] While some of the introductory background in this subsection is not part of the record on appeal, it is included to assist in understanding the historical precursor to this litigation. We note that our analysis and decision of the legal issues in these appeals rest solely on the record.

[2] *See* Brent Richards Weisman, *Unconquered People: Florida's Seminole and Miccosukee Indians* 5–8 (Univ. Press of Fla. 1999). The Miccosukee Indians are descended from the Creek Nation, an association of villages that stretched across what is now Alabama and

3

Miccosukees' historical association with their neighbors the Seminole Indians was tempered by the fact that the Miccosukees spoke their own language, Mikasuki. The federal government formally recognized the Miccosukee Tribe of Indians of Florida in 1962. Tribe members live and work on several reservations within the Everglades.

Geologists estimate that the Everglades formed about 5,000 years ago.[3] The Indians called the place Pa-hay-okee, meaning "Grassy Water." A British cartographer labeled it the River Glades, and author Marjory Stoneman Douglas suggested that later mapmakers substituted the word "Ever" for River.[4] The name

Georgia, and it is suggested that their ancestors might have first reached the southeastern United States as long as 10,000 years ago. *See* Miccosukee Tribe of Indians of Florida, *History*, http://www.miccosukee.com/tribe_history1.htm (last visited Aug. 25, 2010). Under Eleventh Circuit procedure, the Clerk of this Court maintains a downloaded copy of all the Internet sources cited in this opinion.

[3] Patrick J. Gleason & Peter Stone, *Age, Origin, and Landscape Evolution of the Everglades Peatland*, *in Everglades: The Ecosystem and its Restoration* 149, 150 (Steven M. Davis & John C. Ogden eds., 1994).

[4] Marjory Stoneman Douglas*, The Everglades: River of Grass* 7 (Pineapple Press 1988) (1947). Douglas described the beauty of the Everglades, as well as early reports of its dangers:

> The miracle of the light pours over the green and brown expanse of saw grass and of water, shining and slow-moving below, the grass and water that is the meaning and the central fact of the Everglades of Florida. It is a river of grass.
>    . . . .
>    . . . 'The Everglades' was described as a series of vast, miasmic swamps, poisonous lagoons, huge dismal marshes without outlet, a rotting, shallow, inland sea, or labyrinths of dark trees hung and looped about with snakes and dripping mosses, malignant with tropical fevers and malarias, evil to the white man.

*Id.* at 5–6.

Everglades appeared on American military maps during the Seminole Wars.

The Everglades covers much of the half of Florida south of Orlando. Historically, water moved southward from the Kissimmee River to Lake Okeechobee, then south and southwest into Florida Bay.[5] From Lake Okeechobee to the Gulf of Mexico, the land declines almost imperceptibly—on average only three inches per mile—so that the water forms a shallow, thirty-mile wide river, moving slowly southward.[6]

In bad weather the water did not always move so gently. A hurricane in September 1928 caused a breach of the Okeechobee levee, drowning upwards of 2,000 farm workers.[7] The tragedy increased public awareness of the dangers of uncontrolled Everglades waters. At the same time, the population of Florida was

---

[5] Appellee U.S. Army Corps of Engineers has posted animated maps of the historic, present, and planned water flows of the Everglades at http://www.evergladesplan.org/education/requested_downloads.aspx (click on "view and compare") (last visited Aug. 25, 2010).

[6] H. Fling *et al.*, *The Role of Flow in the Everglades Landscape* 1–2 (Univ. of Fla. Cooperative Extension Service, Dec. 2004), *available at* http://edis.ifas.ufl.edu/uw199.

[7] *See* Nat'l Weather Serv. Weather Forecast Office Miami, *Memorial Web Page for the 1928 Okeechobee Hurricane* (June 29, 2009), http://www.srh.noaa.gov/mfl/?n=okeechobee. While no precise count of the dead ever emerged, it has been suggested that the Okeechobee hurricane was second only to the Galveston hurricane in 1900 as the deadliest natural disaster in United States history. *Id.* Many of the dead were Caribbean migrant workers who were either swept into the Everglades or buried in mass graves. Estimates of the death toll range from 1,700 to more than 2,500. *Id.* By comparison, Hurricane Katrina killed approximately 1,800 in 2005. Zora Neale Hurston described the Okeechobee hurricane in her 1937 novel *Their Eyes Were Watching God*.

continuing to grow, and with it the demand for land, food, and water.  In 1948,

Congress passed the Flood Control Act, Pub. L. No. 80-858, 62 Stat. 1171, 1176,

authorizing the Central and Southern Florida plan to control flooding in the

Everglades, and promote agriculture and water supply.  The effect of the series of

levees and canals that followed was to shunt more water out through the east and

west coasts of Florida, and drastically reduce the southward flow through the

Everglades.

The Tamiami Trail (the Trail), also known as U.S. Highway 41, was the first

highway to cross the Everglades.  Its name derives from the cities at its ends,

Tampa and Miami.  Construction began during the First World War and took more

than a decade to complete.  When workers were not battling the swamp, they were

using dynamite to break through the rock beds on the Naples side.[8]  While the

newer Interstate 75 to the north, called "Alligator Alley," carries more vehicles

across the Everglades every day, the Trail remains a vital road and hurricane

evacuation route.  Some of the east-west portion of the Trail runs along the

northern boundary of Everglades National Park.[9]

---

[8]  Carrie Scupholm, *Connecting the East and West Coasts: The Tamiami Trail of the Sunshine State*, *in Looking Beyond the Highway: Dixie Roads and Culture* 73, 78 (Claudette Stager & Martha Carver eds., 2006).

[9]  In 1934, Congress passed legislation creating the Everglades National Park, 48 Stat. 816 (codified at 16 U.S.C. § 410 *et seq.*), and declining to diminish "any existing rights of the Seminole Indians which are not in conflict with the purposes for which the Everglades National

Although the Trail remains an impressive engineering achievement, it poses a substantial environmental challenge. It acts as a dam to restrict water from flowing south into Everglades National Park and greatly reduces the flow into the Shark River Slough, the main water corridor of the Everglades. Moreover, to preserve the roadbed from erosion, engineers found that they had to lower water levels of the surrounding swamp. The restricted water flow was subsequently blamed for vast losses of wading birds, fish, and native plants.

*b. Efforts to Restore the Everglades' Historic Flows*

On the strength of renewed concerns about the health of the Everglades, in 1989 Congress enacted the Everglades National Park Protection and Expansion Act, Pub. L. No. 101-229, 103 Stat. 1946, 16 U.S.C. § 410r-5 *et seq.* (ENPPEA). The ENPPEA directed federal agencies to research ways to improve water flow in the park, and describe them in a report titled "Modified Water Deliveries to Everglades National Park." In 2000, the President signed the Water Resources Development Act, Pub. L. No. 106-541, § 601, 114 Stat. 2572, 2680 (WRDA), outlining the thirty-year Comprehensive Everglades Restoration Plan (CERP) that updated the original Central and Southern Florida plan for the Everglades. One element of CERP called for improvement of water flow through the Trail.

---

Park is created." 16 U.S.C. § 410b.

In June 2008, the U.S. Army Corps of Engineers (Corps) issued its Final Limited Reevaluation Report and Environmental Assessment (LRR/EA) concerning improvements to the Trail.[10]  It concluded that the most effective and economical option of all the ones studied was "Alternative 3.2.2.a"—construction of a mile-long bridge at the eastern end of the Trail.  The bridge would replace the current ground-level roadbed and would greatly increase the amount of water that could flow southward into the Shark River Slough.

On June 18, 2008, the Tribe sued the Corps, claiming that the selection of Alternative 3.2.2.a violated the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* (NEPA), the Federal Advisory Committee Act, 5 U.S.C. app. 2 (FACA), and WRDA.  For ease, we refer to this case as the NEPA case.[11]  The Tribe claimed that the federal government failed to obey federal environmental laws in planning the bridge, in part by failing to prepare adequate statements of environmental impact.  Moreover, the lawsuit alleged that higher water levels

---

[10]  This final version of the LRR/EA is available at http://www.saj.usace.army.mil/Divisions/Everglades/Branches/ProjectExe/Sections/LECSW/MWD/DOCS/TamiamiTrail/Final/MWD-TTM_Final_LRR_MainDoc.pdf.  The addendum, dated July 28, 2008, is available at http://www.saj.usace.army.mil/Divisions/Everglades/Branches/ProjectExe/Sections/LECSW/MWD/DOCS/TamiamiTrail/20080728_TTM_LRR_EA_Addendum_Final.pdf.

[11]  We note that two days earlier, on June 16, 2008, the Tribe sued the United States and the Secretary of the U.S. Department of Transportation (the DOT case), claiming that the Department of Transportation failed to conduct the required review of the bridge project.  This case, also before Judge Ungaro, led to a separate appeal to the Eleventh Circuit, which we resolve with a separate opinion, No. 09-11891.

would flood tribal lands and tree islands.  The Tribe asked for judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and requested an injunction to stop the construction.

*c.  Congress's First Appropriations Bill*

Congress in the meantime continued to legislate on Everglades restoration. On September 30, 2008, Congress passed a continuing appropriations act, Pub. L. No. 110-329, 122 Stat. 3574.  Section 153 of the act spoke to the immediate building of the bridge:

> SEC. 153.  Amounts provided by section 101 for implementation of the Modified Water Deliveries to Everglades National Park shall be made available to the *Army Corps of Engineers, which shall immediately carry out Alternative 3.2.2.a to U.S. Highway 41 (the Tamiami Trail)* as substantially described in the Limited Reevaluation Report with Integrated Environmental Assessment and addendum, approved August 2008 . . . .

122 Stat. at 3581 (emphasis added).

On October 24, 2008, the Tribe filed suit against the Corps and the U.S. Fish and Wildlife Service, alleging violations of the Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.* (ESA).  We refer to this case as the ESA case.  The lawsuit alleged that a biological opinion issued by the Fish and Wildlife Service failed to fully address the bridge's threat to the continued survival of two endangered bird species, the snail kite and the wood stork.  There are two wood

9

stork colonies close to the planned bridge route.  Like the NEPA suit, the ESA suit sought a court order blocking construction of the bridge until the federal government complied with the law.

Meanwhile, the Corps moved to dismiss the NEPA suit, citing § 153 of Congress's continuing appropriations act.  On October 31, 2008, the NEPA court denied the Corps's motion to dismiss the Tribe's suit for lack of subject matter jurisdiction, holding that § 153 was not specific enough to exempt the Corps from NEPA.  Section 153 neither mentioned NEPA by name, nor included the key phrase "notwithstanding any other provision of law," which the court described as "the language usually associated with an exemption or limited repeal."  D.E. 59 at 5.  Shortly thereafter, on November 13, 2008, the NEPA court granted in part the Tribe's motion for a preliminary injunction to enjoin the Corps from building the bridge until it complied with environmental procedures.

d. *Congress's Omnibus Appropriations Act of 2009*

On March 11, 2009, Congress passed the Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524 (Omnibus Act).  The Omnibus Act included this passage:

CONSTRUCTION
(INCLUDING RESCISSION OF FUNDS)

For construction, improvements, repair or replacement of physical facilities, including a portion of the expense for the modifications

10

authorized by section 104 of the Everglades National Park Protection and Expansion Act of 1989, $233,158,000, to remain available until expended:

*Provided*, That funds appropriated in this Act, or in any prior Act of Congress, for the implementation of the Modified Water Deliveries to Everglades National Park Project, shall be made available to the Army Corps of Engineers which *shall, notwithstanding any other provision of law, immediately and without further delay construct or cause to be constructed* Alternative 3.2.2.a to U.S. Highway 41 (the Tamiami Trail) *consistent with* the Limited Reevaluation Report with Integrated Environmental Assessment and addendum, approved August 2008 . . . .

123 Stat. at 708 (emphases added). In the following discussion, we refer to the phrase "notwithstanding any other provision of law" as the notwithstanding clause. We call the phrase "immediately and without further delay" the immediacy clause.

On June 16, 2009, the NEPA court, in response to the Corps's renewed motion to dismiss for lack of subject matter jurisdiction, held that the Omnibus Act is an "explicit exemption" from NEPA and FACA that moves the bridge "from the reach of such statutes." D.E. 128 at 7. The court found it significant that Congress added the same notwithstanding clause that the court had found lacking in the earlier appropriations act. The NEPA court also rejected the Tribe's constitutional challenges to the Omnibus Act: vagueness, delegation, separation of powers, bill of attainder, due process, and equal protection. The NEPA court dismissed the suit for lack of subject matter jurisdiction, and dissolved the preliminary injunction that

11

it had earlier entered.  The Tribe timely appealed.

The Corps filed a copy of the NEPA court's dismissal with the ESA court. On August 31, 2009, the ESA court adopted the reasoning of the NEPA court to conclude it too lacked subject matter jurisdiction over the Tribe's claims.  The ESA court also invoked the doctrine of collateral estoppel to bar the Tribe from relitigating its constitutional challenges to the Omnibus Act because the NEPA court had already rejected them.  The ESA court granted the United States' motion to dismiss the suit for lack of subject matter jurisdiction.  The Tribe filed its notice of appeal the next day.

## II.  Standard of Review

The district court's grant of a motion to dismiss for lack of subject matter jurisdiction presents a legal question that we review *de novo*.  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (citation omitted).  "In construing a statute we must begin, and should often end . . . with the language of the statute itself."  *Kehoe v. Fid. Fed. Bank & Trust*, 421 F.3d 1209, 1212 (11th Cir. 2005) (citation omitted).  We review the district court's invocation of collateral estoppel *de novo*.  *United States v. Weiss*, 467 F.3d 1300, 1308 (11th Cir. 2006) (citation omitted).

## III.  Types of Repeal

The main question here is whether the Omnibus Act modifies the NEPA, FACA, and ESA for purposes of the Tribe's lawsuits, thereby depriving the federal courts of subject matter jurisdiction to hear the Tribe's claims. Besides being the principal issue of this appeal, the question and the answer also control the outcome in the related appeal No. 09-11891 (the DOT case). The focus is on the interaction between the Omnibus Act and previous acts of Congress. The term for this dynamic is repeal—whether and how a later act of Congress modifies an earlier one. Another name for it is exemption.

The Tribe claims that the Omnibus Act effects no explicit repeal here because it fails to mention any statute it is repealing. The Tribe also claims that the Corps has failed to meet the high standard for showing that an appropriations act effects an implied repeal. The Corps counters that the plain language of the Omnibus Act, in particular Congress's addition of the notwithstanding clause, makes it clear that Congress intended to relax its existing environmental statutes in order to get the bridge built as quickly as possible.

At oral argument, counsel for the Tribe said a repeal has to be either express or implied. While that statement may be true, it does not necessarily follow, as counsel claimed, that there are only two modes of repeal. Supreme Court and Eleventh Circuit cases, and *Sutherland Statutes and Statutory Construction*, seem

13

to identify at least three: explicit repeals, general repealing clauses, and implied repeals.[12]  We review the characteristics of each in turn.

a. *Explicit Repeals*

An explicit repeal occurs when the later statute explicitly identifies the earlier statute it is repealing.  1A *Sutherland Statutes and Statutory Construction* § 23:7 (7th ed. 2010).  Congress can accomplish this identification by citing the earlier statute or referring to its subject matter, *id.*, or even by giving the style and case number of a lawsuit that is filed under the earlier statute, *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 440, 112 S. Ct. 1407, 1414 (1992).[13]

Congress walks a fine line in terms of what it may do here and still uphold the separation of powers.  Congress may not interfere in the judicial process.  It may not dictate the result for a particular case, or tell an Article III court how to apply the law to specific facts.  *See Nichols v. Hopper*, 173 F.3d 820, 823 (11th Cir. 1999); *Henderson v. Scientific-Atlanta, Inc.*, 971 F.2d 1567, 1573 (11th Cir.

_____

[12]  Courts have noted that repeals go by various names, and moreover that the boundaries between types of repeals are not written in stone.  *See, e.g.*, *Bald Eagle Ridge Prot. Ass'n, Inc. v. Mallory*, 119 F. Supp. 2d 473, 480 (M.D. Pa. 2000) (noting that repeals can be called "repeal by implication, exemption, suspension, or any other word or phrase which may be used to characterize this action").

[13]  The repealing statute in *Seattle Audubon Society* also contained an explicit jurisdiction-stripping provision.  503 U.S. at 435 n.2, 112 S. Ct. at 1411 n.2 (quoting Pub. L. No. 101-121, § 318(b)(6)(A), 103 Stat. 701, 747).  The Tribe argues that because the Omnibus Act lacked similar jurisdiction-stripping language, the district courts erred in dismissing the lawsuits. But neither *Seattle Audubon* nor any other case cited by the Tribe makes such language a requirement for an explicit repeal.

1992).

But Congress is always free to amend the law, even if doing so has the effect of extinguishing a pending case. *See Seattle Audubon Society*, 503 U.S. at 440, 112 S. Ct. at 1414; *Scientific-Atlanta*, 971 F.2d at 1573. And among the areas in which Congress legislates is the jurisdiction of the federal courts. Congress often exercises its power both to confer jurisdiction, and to deny it. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 274, 114 S. Ct. 1483, 1501 (1994). "[T]here is an important difference between Congress telling this court how it should decide a particular case (expressly prohibited by *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147 (1871)) and Congress withdrawing jurisdiction to decide a particular case . . . ." *Nat'l Coal. to Save Our Mall v. Norton*, 161 F. Supp. 2d 14, 22 (D.D.C. 2001).

*b. General Repealing Clauses*

To effect an explicit repeal, a statute must identify the repealed statute. If it does not, a statute may still sometimes effect a repeal through the use of a "general repealing clause." *Sutherland* § 23:8. One example of such a clause is "[n]otwithstanding any other Federal law." *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc) (quotation omitted). The Supreme Court has found these phrases have the power to override other law:

15

> As we have noted previously in construing statutes, the use of such a "notwithstanding" clause clearly signals the drafter's intention that the provisions of the "notwithstanding" section override conflicting provisions of any other section. Likewise, the Courts of Appeals generally have interpreted similar "notwithstanding" language to supersede all other laws, stating that [a] clearer statement is difficult to imagine.

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, 113 S. Ct. 1898, 1903 (1993) (citations, omission, and quotations omitted) (interpreting the clause "[n]otwithstanding any other provisions of this Contract" in a Section 8 landlord contract).

Our Court has previously read these clauses the same way. In *Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1337 (11th Cir. 2006) (per curiam) (citing *Cisneros*), our Court held that the same general repealing clause at issue here, "notwithstanding any other provision of law," worked an exemption to an earlier statute concerning hiring standards for TSA screeners.[14]

In *Castro*, the plaintiff sued the Department of Homeland Security (DHS), claiming that it violated the Rehabilitation Act of 1973 by citing his history of seizures as a reason not to hire him. The district court granted DHS's motion to dismiss for failure to state a claim, finding that the Aviation and Transportation

---

[14] In the interest of precision, we note that the repealing statute at issue in *Castro* contained two general repealing clauses: "Notwithstanding any other provision of law," 49 U.S.C. § 44935 note, and "Notwithstanding any provision of law," 49 U.S.C. § 44935(e)(2)(A), (f)(1). *See Castro*, 472 F.3d at 1336–37. We do not dwell on the slight difference.

Security Act (ATSA) that Congress passed after the 9/11 terrorist attacks exempted DHS from the nondiscrimination provisions of the Rehabilitation Act.

This Court affirmed, holding that the "notwithstanding" clause was "Congress's indication that the statute containing that language is intended to take precedence over any preexisting or subsequently-enacted legislation [on the same subject]." *Id.* (omission and citation omitted). While this plain language alone was enough to effect a repeal, this Court also noted that ATSA specified physical requirements for security screeners—"color perception, visual and aural acuity, physical coordination, and motor skills," 49 U.S.C. § 44935(f)(1)(B)—that on their face were "inconsistent" with the Rehabilitation Act's prohibition of discrimination on the basis of physical disabilities, 29 U.S.C. § 794(a). 472 F.3d at 1337–38. *Castro* directs our inquiry here both for its evaluation of the notwithstanding clause, and its plain-language approach to statutory construction.

The Ninth Circuit has read this phrase the same way. In doing so, that court emphasized the importance of statutory context. Hearing an appeal to an environmental lawsuit, *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1169 (9th Cir. 2007), the Ninth Circuit held that the phrase "[n]otwithstanding any other provision of law" in an omnibus tax bill exempted the United States from NEPA and ESA for purposes of lining the All

17

American Canal "without delay."

The Ninth Circuit noted that the notwithstanding clause is not always applied in blanket fashion. "We have repeatedly held that the phrase 'notwithstanding any other provision of law' is not always construed literally. Rather, when the phrase is used, we have determined its reach by 'taking into account the whole of the statutory context in which it appears.'" *Id*. at 1168 (internal quotations and citations omitted).[15]

Further complicating matters is the question of whether a general repealing clause *requires* the finding of a conflict between the newer and older statutes. Some courts base their finding of repeal via a general repealing clause on an "irreconcilable conflict." *See, e.g.*, *Norton*, 161 F. Supp. 2d at 21; *Sutherland* § 23:8 (noting that a general repealing clause "has sometimes been held to repeal

---

[15] Commentators likewise have noted the difficulty of interpreting the notwithstanding clause. The clause "notwithstanding any other provision of law" is "the statutory equivalent of a parent telling a child 'I'm serious,' or 'I really mean it.' Despite the admonition, courts and administrators still must determine what the underlying directive means. And, ordinarily, there will still be other provisions of law that apply; the trick is to determine which ones." Yule Kim, Cong. Research Serv., *Statutory Interpretation: General Principles and Recent Trends* 35 (2008), *available at* http://assets.opencrs.com/rpts/97-589_20080831.pdf:

> In this sense, the statutory phrase is analogous to a parent telling a child "don't under any circumstances leave the house until I return." The parent doesn't really mean for the child to remain under any and all circumstances, but instead assumes that the child will try to get out if the house catches on fire or some other emergency occurs.

*Id.* n.200.

18

because an act conflicts"). In *Castro*, our Court noted that the two statutes were "inconsistent," but said the plain language of the notwithstanding clause was by itself sufficient to support a repeal. 472 F.3d at 1337.

We acknowledge that an open-ended general repeating clause carries the potential to create confusion about precisely which laws, if any, it is repealing.[16] A general repealing clause operates in the twilight between the clearer extremes of explicit and implied repeals. A general repealing clause is explicit only in the sense that it is announcing a repeal of "all law" or "any law" or "federal laws"—its actual reach depends on an analysis of the statutory language relevant to it. Without that careful analysis, a general repealing clause is a blunt tool prone to repeal too little or too much.

*c. Implied Repeals*

A statute effecting an implied repeal, also known as a repeal by implication or implicit repeal,[17] does not identify the statute it is repealing. Nor does it have a

_____

[16] For example, courts and commentators have long noted that a general repealing clause that repeals all "inconsistent law" is basically a logical nullity, because the doctrine of implied repeals (*see* "Implied Repeals," Part III.c, *infra*) already neutralizes any inconsistent earlier law in favor of the newer repealing law. *See Sutherland* § 23:8 ("An express general repealing clause to the effect that all inconsistent enactments are repealed should legally be a nullity."); *Great N. Ry. Co. v. United States*, 155 F. 945, 947 (8th Cir. 1907) (Van Devanter, J.) (citations omitted) ("[T]he general repealing clause in section 10, 'All laws and parts of laws in conflict with the provisions of this act are hereby repealed,' . . . repeals nothing which would not be repealed equally without it.").

[17] As stated before, courts do not use consistent terms to describe these repeals. For example, a Pennsylvania district court found a repeal by implication of NEPA when a federal

general repealing clause, like the notwithstanding clause at issue here. What is key is the legislature's demonstration of intent to repeal a pre-existing law. *Sutherland* § 23:9. Congress's intent to effect an implied repeal can be inferred when a later statute conflicts with or is repugnant to an earlier statute; or when a newer statute covers the whole subject of the earlier one, and clearly is intended as a substitute. *See United States v. Devall*, 704 F.2d 1513, 1518 (11th Cir. 1983); *see also Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 951 (11th Cir. 2001) (Black, J., concurring) (listing cases requiring a "positive repugnancy" between two statutes as a precondition for finding an implied repeal). Therefore for an implied repeal, a conflict is a minimum requirement, rather than the helpful sign of legislative intent supporting a general repealing clause.

The Eleventh Circuit has held that when two statutes conflict, the later-enacted statute controls to the extent it conflicts with the earlier-enacted statute. *Nguyen v. United States*, 556 F.3d 1244, 1252–53 (11th Cir. 2009). Moreover, a specific statutory provision trumps a general one. *Id.* at 1253. The conclusion that two statutes conflict, however, is one that courts must not reach lightly. If any interpretation permits both statutes to stand, the court must adopt that interpretation, "absent a clearly expressed congressional intention to the contrary."

---

highway statute used the general repealing clause "notwithstanding any other provision of law." *Mallory*, 119 F. Supp. 2d at 484.

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006). Courts must first "assiduously attempt" to try to construe two statutes in harmony before concluding that one impliedly repeals the other. *Tug Allie-B*, 273 F.3d at 952.

Because a repeal by implication requires the most speculation about the intent of Congress, there is a presumption against finding one. *TVA v. Hill*, 437 U.S. 153, 189, 98 S. Ct. 2279, 2299 (1978) (concluding that Congress's repeated appropriations bills funding construction of a dam did *not* impliedly repeal ESA protection for a new species of fish endangered by the project); *Patel v. Quality Inn S.*, 846 F.2d 700, 704 (11th Cir. 1988) ("Only when Congress' intent to repeal or amend is clear and manifest will we conclude that a later act implicitly repeals or amends an earlier one."); *see also Tug Allie-B*, 273 F.3d at 959 (noting the "principles of judicial restraint and separation of powers which underlie the particularly high standard required for an implicit repeal").

This presumption against repeal by implication applies with "even *greater* force" to an appropriations bill, because legislators are entitled to assume that they only appropriate money for lawful purposes. *TVA*, 437 U.S. at 190, 98 S. Ct. at 2300. Congress has the power to effect a repeal through an appropriations bill—Congress just needs to be clear it is doing so. *United States v. Will*, 449 U.S. 200, 222, 101 S. Ct. 471, 484 (1980).

## IV. Analysis

In this case, we hold that the notwithstanding clause of the Omnibus Act, analyzed within its surrounding statutory language, repeals the relevant environmental laws so as to deprive the federal courts of subject matter jurisdiction over the Tribe's suits. The district court's finding that there was an "explicit exemption" from the environmental laws, while yielding the correct result, blurred the lines between the categories of repeal established in the cases. We believe it is correct and clearer to identify as such the general repealing clause that is at work here. Our analysis of the Omnibus Act proceeds in three parts. First, we measure the effect of the notwithstanding clause. Second, we consider the immediacy clause. Lastly, we examine the imperative "shall," which deprives the Corps of discretion and therefore strengthens the case against judicial review here.

*a. Notwithstanding Clause*

In the Omnibus Act, the notwithstanding clause splits the verb phrase "shall . . . construct or cause to be constructed." Therefore, the clause speaks directly to any laws regulating the construction of the bridge. The environmental laws clearly applied to such a bricks-and-mortar project. To the extent they did, the notwithstanding clause repeals them.

We base our conclusion in the statutory language in which the

notwithstanding clause appears.[18]  As the Ninth Circuit noted in *Consejo*, a general

repealing clause must be read in the context of the entire statute.  Indeed, this point

highlights the weakness in the Tribe's argument that the notwithstanding clause

works only to repeal appropriations laws relating to the bridge.  The Tribe argues

that the primary purpose of this bill is to appropriate money for improvements to

Everglades National Park, and that the only grammatical effect of the "*Provided*"

clauses that follow the main clause is to qualify the appropriation of money.

Therefore, the Tribe concludes, a notwithstanding clause located within a

"Provided" clause can only repeal appropriations laws.

While this argument has superficial appeal, its focus is fatally overbroad.

The more specific and grammatically relevant analysis of the notwithstanding

clause is that it speaks to the verb construct, rather than to the syntactically more

distant language of appropriating.  The Tribe has no good rejoinder to this point.

Moreover, the Omnibus Act uses broad language here: "notwithstanding *any*

---

[18]  The district court also based its finding of an exemption on the observation that Congress included the notwithstanding clause in the Omnibus Act after the district court pointed out the clause's absence from Congress's earlier-enacted § 153.  Inclusion of the notwithstanding clause the second time around "is not coincidental but rather underscores the Court's conclusion here regarding Congress's clear intent."  D.E. 128 at 6.  While we prefer to ground our holding in the plain language of the statute, we acknowledge the common-sense appeal of this argument.  After all, amending statutes is one of Congress's time-honored ways of surmounting judicial interpretations with which it disagrees.  *See Scientific-Atlanta*, 971 F.2d at 1571–72 & n.4.  And if successive drafts of a statute provide fodder for proponents of legislative history, *see Sutherland* § 45:6 & n.5, then successive statutes furnish better evidence still.

23

other provision of law." 123 Stat. at 708 (emphasis added). Nothing about the word "any" suggests that "law" should refer only to appropriation laws, rather than "any" laws.[19]

Our finding of a repeal squares with our precedent in *Castro*. If *Castro* were to call our result an exemption rather than repeal via a general repealing clause, the functional difference, if any, would be slight. At oral argument, counsel for the Tribe sought to distinguish *Castro* by noting that both the statutes there spoke to the same subject matter, whereas here a budget law would repeal environmental laws. This objection is unavailing. Even if one grants the Tribe's assumption that the Rehabilitation Act and ATSA do address the same subject matter, there is nothing in theory that prevents a budget bill from discussing a public works project in great detail, as the Omnibus Act here well illustrates.

The Omnibus Act sufficiently specifies its subjects, and uses precise language to identify the bridge. The cursory labels applied to a bill—"budget," "defense," "health care"—do not dictate the repeal analysis. The notwithstanding clause therefore repeals the environmental laws under which the Tribe filed suit.

---

[19] Further undercutting the Tribe's argument is the fact that environmental laws, not budgetary ones, were the legal sticking point for the bridge in the run up to Congress's passage of the Omnibus Act. There is accordingly no circumstantial case that the notwithstanding clause was inserted solely to repeal appropriations laws. The Tribe asks us to consider the implications of Congress repealing all laws potentially bearing on the bridge—for example the wage and hour laws—but answering that question is not necessary for our decision here. Our Court in *Castro* previously declined to answer the same broader question. 472 F.3d at 1337 n.1.

*b. Immediacy Clause*

In the Omnibus Act, Congress orders the Corps to build the bridge "immediately and without further delay." Like the notwithstanding clause, this immediacy clause also splits the verb phrase "shall . . . construct." Our cases require us to read such simple English simply. "In the absence of a statutory definition of a term, we look to the common usage of words for their meaning." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (quotation omitted).

The simplest reading of this plain language is that Congress wanted the bridge built now. Congress sought to facilitate this goal by repealing the environmental laws that it had previously passed. Allowing further administrative challenges to the bridge under those environmental laws, more than two decades after Congress passed legislation seeking to improve water flows in the Everglades, would further delay the speedy completion of the bridge and frustrate Congress's clear intent.

In this way, the immediacy clause creates a direct conflict with the time-consuming administrative review mandated by the environmental laws, and therefore the environmental laws must yield. This finding of a conflict cements our conclusion that Congress effected a repeal here. We reach this conclusion

25

without deciding the issue of whether finding a conflict is necessary for the operation of a general repealing clause.

*c. Mandatory Language*

In the Omnibus Act, Congress directs that the Corps *shall* build the bridge as described in the June 2008 LRR/EA report. This command denies the Corps any discretion in the matter. This lack of discretion is a third reason why the federal courts have no subject matter jurisdiction over the Tribe's suits. Claims brought against an agency under NEPA, FACA, or the ESA proceed only when the agency has choices in a matter—here, choices between alternatives that vary in their environmental friendliness. Here, no discretion means no jurisdiction.

Procedural statutes like NEPA do not apply when an agency has no discretion to act or not to act on a given matter. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770, 124 S. Ct. 2204, 2217 (2004) (holding that NEPA does not apply to an agency that lacks statutory authority to act in the relevant manner); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669, 127 S. Ct. 2518, 2536 (2007) (same holding under the ESA); *Florida Key Deer v. Paulison*, 522 F.3d 1133, 1144 (11th Cir. 2008) (discussing *Public Citizen*) ("[A]n agency cannot be held accountable for the effects of actions it has no discretion not to take."). Moreover, the tension between the Corps's lack of discretion under the

26

"shall" of the Omnibus Act, and the environmental statutes' presumption of agency

discretion, is an additional conflict between the statutes that we conclude supports

a finding of repeal here.

The Omnibus Act of course refers to the LRR/EA, which in turn contains

oblique references to NEPA and ESA.[20] These stray mentions are descriptive

rather than prescriptive, and they are not to be mistaken for a grant of Article III

jurisdiction.[21] Quite the opposite obtains. When a legislature writes a set of

administrative findings into law, the administrative findings become legislative

ones, and thus are no longer reviewable through the ordinary avenues of

administrative law. As one court put it, in this posture "the record of decision

became a legislative action and not an administrative action. In effect, there is no

longer an administrative action for us to review." *Mallory*, 119 F. Supp. 2d at 481.

*Mallory* was a Pennsylvania district court decision that concluded that the

notwithstanding clause in a transportation bill incorporating the administrative

---

[20] The LRR/EA states that the environmental data on the bridge had been compiled "in compliance with NEPA," LRR/EA at 5-56, and moreover that the bridge "would comply" with the ESA, LRR/EA at 5-55.

[21] Counsel for the Tribe conceded at oral argument that it had waived this argument on appeal because it had failed to argue it to the district courts below. We generally do not consider arguments raised for the first time on appeal. *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1215 n.8 (11th Cir. 2010) (citation omitted). We note it now only because it falls within the sweep of our plain-language analysis of the Omnibus Act. The Tribe conceded moreover that it waived a second argument by failing to make it to the courts below: that any repeal or exemption found within an appropriations bill can last only one year because of the annual nature of the appropriations cycle.

record of decision effected an implied repeal of NEPA and the Clean Water Act for a federal interstate highway project. *Mallory* went on to state: "That is, by making the administrative decision a legislative decision, Congress has barred plaintiffs from seeking review of the administrative decision. Moreover, the action removes from the administrative agencies any discretion they may have had: they now are required by statute to act in a predetermined manner." *Id.* at 482.

We believe the analysis in *Mallory* applies here. The lack of discretion in Congress's command to build the bridge precludes the applicability of statutes like NEPA or the ESA, which presume agency discretion as a starting point. And, the adoption of the administrative finding as a legislative finding bars judicial review of agency action.

### V. Conclusion

The NEPA court, clearly aware of the high legal standard for an implied repeal of NEPA and FACA, concluded that the Omnibus Act effected an "explicit exemption . . . from the reach of such statutes." D.E. 128 at 7. It did this even though the Omnibus Act does not explicitly mention any statute it is repealing. The Tribe correctly points out that the Omnibus Act language does not meet the generally understood test for an explicit repeal. For the reasons we have already stated, we prefer to describe this repeal as one resulting from a general repealing

28

clause.[22]  Moreover, for the reasons stated by the district court in the NEPA case, we find that the Tribe's constitutional challenges to the Omnibus Act are without merit.[23]  We therefore affirm the district courts' dismissals for lack of subject matter jurisdiction.  Therefore, we affirm the judgments of the district courts.

**AFFIRMED.**

---

[22]  We also reject the Tribe's request for us to apply the rule of construction that ambiguous statutes must be read in the Indians' favor because the Omnibus Act is an unambiguous statute.  *See, e.g.*, *Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1131 (11th Cir. 1999).

[23]  Any possible error in the ESA court's application of collateral estoppel to bar the Tribe's constitutional claims is harmless given this panel's determination of the same constitutional issues on the merits.