WATFORD, Circuit Judge,
dissenting:
The majority states that, by enacting § 124, “Congress did nothing more than let the Secretary know his hands were not tied.” Maj. op. at 1086. I think Congress, by including the “notwithstanding” clause in § 124, intended to do more than that. In particular, it sought to override the Department of the Interior’s misinterpretation of the Point Reyes Wilderness Act, Pub.L. No. 94-544, 90 Stat. 2515 (1976).
The Department had concluded, in 2005, that the Act barred issuance of a special use permit authorizing continued operation of Drakes Bay Oyster Company’s oyster farm. The Department thought Congress had “mandated” that result by designating Drakes Estero, where the oyster farm is located, as a “potential wilderness addition” in the Point Reyes Wilderness Act. The Act’s legislative history makes clear, however, that by divining such a mandate, the Department simply misinterpreted the Act’s provisions and misconstrued Congress’s intent. The Department’s misinterpretation of the Point Reyes Wilderness Act prompted Congress to enact § 124 in 2009. In my view, by including a notwithstanding clause in § 124, Congress attempted to supersede the Department’s erroneous interpretation of the Act.
In the 2012 decision challenged here, the Secretary nonetheless denied Drakes Bay’s permit request based primarily on the very same misinterpretation of the Point Reyes Wilderness Act that Congress thought it had overridden. As a result, I think Drakes Bay is likely to prevail on its claim that the Secretary’s decision is arbitrary, capricious, or otherwise not in accordance with law. See 5 U.S.C. § 706(2)(A). Because the other preliminary injunction factors also weigh in Drakes Bay’s favor, injunctive relief preserving the status quo should have been granted here.
I
To explain why I think the Interior Department (and later the Secretary) misinterpreted the Point Reyes Wilderness Act, a fairly detailed discussion of the Act’s legislative history is necessary.
The events leading up to passage of the Point Reyes Wilderness Act begin in 1962, when Congress authorized creation of the Point Reyes National Seashore and appropriated funds for land acquisition within the Seashore’s designated boundaries. Act of Sept. 13, 1962, Pub.L. No. 87-657, 76 Stat. 538 (1962). As part of that process, in 1965, the State of California conveyed ownership of the submerged lands and coastal tidelands within the Seashore’s boundaries to the federal government. See Act of July 9, 1965, ch. 983, § 1, 1965 Cal. Stat. 2604, 2604. Those lands included Drakes Estero. The conveyance reserved certain mineral and fishing rights, which allowed the State to “prospect for, mine, and remove [mineral] deposits from the lands,” and “reserved to the people of the state the right to fish in the waters underlying the lands.” Id. §§ 2-3, 1965 Cal. Stat. at 2605. At the time of the State’s conveyance, oyster farming was already a well-established fixture in Drakes Estero, with roots dating back to the 1930s.
*1094 In 1973, the President recommended that Congress preserve 10,600 acres within the Point Reyes National Seashore as “wilderness,” under the terms of the Wilderness Act of 1964, Pub.L. No. 88-577, § 3(c), 78 Stat. 890, 892 (1964). Members of California’s congressional delegation found that recommendation woefully inadequate, and soon thereafter introduced identical bills in the House and Senate designating far larger areas of the Seashore as wilderness. In the House, Congressman John Burton introduced H.R. 8002, 94th Cong. (1975); in the Senate, Senator John Tunney introduced S. 2472, 94th Cong. (1975). H.R. 8002 is the bill that eventually became the Point Reyes Wilderness Act.
As originally proposed, H.R. 8002 and S. 2472 would have designated more than thirty-eight thousand acres as wilderness. Included within that designation was Drakes Estero, as well as most of the other submerged lands and coastal tidelands conveyed by California in 1965. The sponsors of H.R. 8002 and S. 2472 were well aware of the oyster farm in Drakes Estero. They nonetheless included Drakes Estero within the wilderness designation because they did not view the farm’s operations as incompatible with the area’s wilderness status. Commenting on the Senate bill, Senator Tunney left no doubt on that score, declaring, “Established private rights of landowners and leaseholders will continue to be respected and protected. The existing agricultural and aquacultural uses can continue.” Wilderness Additions — National Park System: Hearings Before the Subcomm. on Parks and Recreation of the S. Comm, on Interior and Insular Affairs, 94th Cong. 271 (1976) [hereinafter Senate Hearing ].
During hearings on H.R. 8002 and S. 2472, various civic, environmental, and conservation groups supported Drakes Este-ro’s designation as wilderness. They explained in detail why neither the State’s reserved mineral and fishing rights nor the oyster farm precluded such a designation. No one advocating Drakes Estero’s designation as wilderness suggested that the oyster farm needed to be removed before the area could become wilderness. See id. at 324-33, 344-61; H.R. 7198, H.R. 8002, et al., To Designate Certain Lands in the Point Reyes National Seashore, California as Wilderness: Hearing Before Sub-comm. on Nat’l Parks and Recreation of the H. Comm, on Interior and Insular Affairs, 94th Cong. (1976) [hereinafter House Hearing ], prepared statements of Jim Eaton, William J. Duddleson, Ms. Raye-Page, and Frank C. Boerger.
The comments Congress received from those who were advocating Drakes Este-ro’s designation as wilderness stressed a common theme: that the oyster farm was a beneficial preexisting use that should be allowed to continue notwithstanding the area’s designation as wilderness. For example, a representative from the Wilderness Society stated: ‘Within Drakes Este-ro the oyster culture activity, which is under lease, has a minimal environmental and visual intrusion. Its continuation is permissible as a pre-existing non-conforming use and is not a deterrent for inclusion of the federally owned submerged lands of the Estero in wilderness.” House Hearing, prepared statement of Ms. Raye-Page, at 6. The Chairman of the Golden Gate National Recreation Area Citizens’ Advisory Commission noted that the oyster-farming operations “presently carried on within the seashore existed prior to its establishment as a park and have since been considered desirable by both the public and park managers.” Senate Hearing, at 361. He therefore recommended that specific provision be made to allow such operations “to continue unrestrained by wilderness designation.” Id. Others observed, echoing the comments of Senator *1095 Tunney, that the proposed House and Senate bills already provided for that. See House Hearing, prepared statement of William J. Duddleson, at 3-4 (“H.R. 8002 would allow continued use and operation of Johnson’s Oyster Company at Drakes Estero, as a pre-existing non-conforming use.”); Senate Hearing, at 357 (“S. 2472 would allow the continued use and operation of Johnson’s Oyster Company in Drakes Estero.”). A local state assemblyman succinctly summed it up this way: “Finally, I believe everyone concerned supports the continued operation of oyster farming in Drakes Estero as a non-conforming use.” Senate Hearing, at 356.
The view expressed by these speakers— that continued operation of the oyster farm was fully compatible with Drakes Estero’s designation as wilderness — was not some wild-eyed notion. It was firmly grounded in the text of the Wilderness Act itself. The Act generally bans commercial enterprise within wilderness areas, but does so “subject to existing private rights.” 16 U.S.C. § 1133(c). Drakes Bay’s predecessor, the Johnson Oyster Company, had existing private rights in the form of water-bottom leases issued by California that pre-dated both the passage of the Wilderness Act and creation of the Point Reyes National Seashore. The Act also generally prohibits the use of motorboats within wilderness areas, see id, but the Secretary of Agriculture may permit continued use of motorboats when, as here, such use has “already become established.” Id § 1133(d)(1). To the extent there is any ambiguity in these provisions, the Act’s legislative history makes clear that Congress believed the new wilderness-preservation system would not affect the economic arrangements of business enterprises “because existing private rights and established uses are permitted to continue.” S.Rep. No. 88-109, at 2 (1963).
The only party opposed to designating Drakes Estero as wilderness was the Department of the Interior. At first, the Department took the position that none of the submerged lands and coastal tidelands conveyed by California in 1965 could be designated as wilderness, because the State’s reserved mineral and fishing rights were “inconsistent with wilderness.” House Hearing, letter from John Kyi, Assistant Secretary of the Interior, at 3. When the Department’s view came under attack by those who argued that the State’s reserved rights were not in any way inconsistent with wilderness, see, e.g., Senate Hearing, at 327-28, the Department backpedaled. It proposed placing most of the lands subject to the State’s reserved rights into a new legislative classification — “potential wilderness addition” — which it had developed in connection with similar wilderness proposals. See House Hearing, at 11-12; id, letter from John Kyi, Assistant Secretary of the Interior, at 1. That designation was intended to encompass “lands which are essentially of wilderness character, but retain sufficient nonconforming structures, activities, uses or private rights so as to preclude immediate wilderness classification.” S.Rep. No. 94-1357, at 3 (1976).
Four areas subject to the State’s reserved rights were at issue: the coastal tidelands, Limantour Estero, Abbotts Lagoon, and Drakes Estero. The original version of H.R. 8002 designated all four areas as wilderness, not just potential wilderness additions. But in the spirit of compromise, Congressman Burton, the sponsor of H.R. 8002, agreed to amend the bill by designating those areas as potential wilderness additions, rather than as wilderness. See House Hearing, prepared statement of Rep. John Burton, at 2. In doing so, he made clear that all four areas were being designated as potential wilderness additions due to California’s reserved *1096 mineral and fishing rights. See id. He noted that, “[a]s ‘potential wilderness,’ these areas would be designated as wilderness effective when the State ceeds [sic] these rights to the United States.” Id. (emphasis added). As so amended, H.R. 8002 was enacted as the Point Reyes Wilderness Act in 1976.
Fast forward now to 2005. Shortly before Drakes Bay’s purchase of the oyster farm closed, the Park Service reiterated its view that, based on a legal analysis performed by the Interior Department, no new permits authorizing oyster farming in Drakes Estero could be issued. The Department’s legal analysis concluded — bizarrely, given the legislative history recounted above — that by designating Drakes Estero as a potential wilderness addition in the Point Reyes Wilderness Act, Congress had “mandated” elimination of the oyster farm. The Department never identified anything in the text of the Act to support that view; it cited only a passage from the House Report accompanying H.R. 8002. But that passage “is in no way anchored in the text of the statute,” Shannon v. United States, 512 U.S. 573, 583-84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994), and thus provides no support for the Department’s interpretation of the Act.
Even taken on its own terms, however, the passage from the House Report does not support the Department’s interpretation. The passage states in full: “As is well established, it is the intention that those lands and waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible, with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status.” H.R.Rep. No. 94-1680, at 3 (1976), 1976 U.S.C.C.A.N. 5593 at 5595 (emphasis added). But the oyster farm was not an “obstacle” to Drakes Estero’s conversion to wilderness status, and no one in Congress ever expressed that view. To the contrary, as discussed above, all indications are that Congress viewed the oyster farm as a beneficial, preexisting use whose continuation was fully compatible with wilderness status.
II
With that background in mind, we can now turn to the legal issue at the heart of this appeal, which is how to construe § 124.
Everyone appears to agree that the Park Service’s conclusion in 2005 that it was legally prohibited from granting Drakes Bay a special use permit prompted Congress to enact § 124. If all Congress had wanted to do was “let the Secretary know his hands were not tied,” as the majority asserts, § 124 could simply have stated, as it does, that “the Secretary of the Interior is authorized to issue a special use permit....” Act of Oct. 30, 2009, Pub.L. No. 111-88, § 124, 123 Stat. 2904, 2932. But Congress went further and added a notwithstanding clause, so that the statute as enacted reads, “notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit_” Id. (emphasis added). Our task is to determine what effect Congress intended the notwithstanding clause to have.
Given the historical backdrop against which § 124 was enacted, I think Congress intended the clause to override the Interi- or Department’s misinterpretation of the Point Reyes Wilderness Act. Reading the clause in that fashion is consistent with the way courts have typically construed notwithstanding clauses. The Supreme Court has held that the use of such a clause “clearly signals the drafter’s intention that the provisions of the ‘notwithstanding’ section override conflicting provisions of any other section.” Cisneros v. Alpine Ridge *1097 Grp., 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). And we have said that the basic function of such clauses is to “sweep aside” and “supersede” any potentially conflicting laws. United States v. Novak, 476 F.3d 1041, 1046 (9th Cir.2007) (en banc); Student Loan Fund of Idaho, Inc. v. U.S. Dep’t of Educ., 272 F.3d 1155, 1166 (9th Cir.2001). A notwithstanding clause often targets those laws that were the “legal sticking point” for the action Congress intends to authorize. Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng’rs, 619 F.3d 1289, 1301 n. 19 (11th Cir.2010).
In this case, no conflicting laws actually prevented the Secretary from issuing a permit to Drakes Bay. Continued operation of the oyster farm is fully consistent with the Wilderness Act, and the farm’s existence is therefore not an “obstacle” to converting Drakes Estero to wilderness status as directed by the Point Reyes Wilderness Act. Instead, it was the Interior Department’s misinterpretation of the Point Reyes Wilderness Act that proved to be the “legal sticking point” here. I think the best reading of the notwithstanding clause is that Congress meant to “override” (“sweep aside,” “supersede”) that misinterpretation of the law when it enacted § 124. Alpine Ridge Grp., 508 U.S. at 18, 113 S.Ct. 1898; Novak, 476 F.3d at 1046; Student Loan Fund, 272 F.3d at 1166.
If you accept what I have said so far, only two questions remain. The first is whether Congress, having overridden the Department’s misinterpretation of the Point Reyes Wilderness Act, nonetheless authorized the Secretary to rely on that misinterpretation as a basis for denying Drakes Bay a permit. I cannot see any reason why we would construe § 124 in that fashion. Under the Administrative Procedure Act (APA), if an agency bases its decision on a legally erroneous interpretation of the controlling statute, its decision will be deemed arbitrary, capricious, or otherwise not in accordance with law. See Safe Air for Everyone v. EPA, 488 F.3d 1088, 1091, 1101 (9th Cir.2007) (involving an erroneous interpretation of a state implementation plan that had the force and effect of federal law). Thus, even without the notwithstanding clause, it would make no sense to assume that Congress authorized the Secretary to base his decision on a misinterpretation of the Point Reyes Wilderness Act. With the clause, adopting any such construction of § 124 would be entirely indefensible.
The second (and admittedly closer) question is whether the Secretary in fact based his decision on the misinterpretation of the Act that Congress intended to override by enacting § 124. The majority suggests that the Secretary based his decision instead on the Interior Department’s own policies, see Maj. op. at 1084-85 & n.5, 1088 n. 8, but I do not think the Secretary’s written decision denying the permit supports that view. The Secretary’s decision states that he gave “great weight” to what he called “the public policy inherent in the 1976 act of Congress that identified Drakes Estero as potential wilderness.” The Secretary read that Act as expressing Congress’s intention that all “obstacles” to converting Drakes Estero to wilderness status should be removed. But he erroneously deemed the oyster farm to be such an obstacle (“DBOC’s commercial operations are the only use preventing the conversion of Drakes Este-ro to designated wilderness”), because he erroneously assumed that the oyster farm’s continued operation was “prohibited by the Wilderness Act.” That in turn led him to conclude — again erroneously— that his decision to eliminate the oyster farm “effectuate[d]” Congress’s intent as expressed in the Point Reyes Wilderness Act.
*1098 These are precisely the same errors of statutory interpretation the Interior Department made back in 2005. They are precisely the same errors that prompted Congress to enact § 124 in the first place. And, in my view, they are precisely the same errors Congress attempted to supersede by inserting the notwithstanding clause. Contrary to the majority’s assertion, the Secretary had no authority to rely on this misinterpretation of “Congress’s earlier expressed goal” because the notwithstanding clause eliminated any such authority. See Maj. op. at 1088 n. 8.
What does the majority offer in response to this analysis? Some hand waving, to be sure, but nothing of any substance. Most tellingly, the majority never attempts to argue that the Interior Department’s interpretation of the Point Reyes Wilderness Act was correct. Nor could it make that argument with a straight face given the Act’s clear legislative history, which the majority never attempts to address, much less refute. The majority thus has no explanation for Congress’s inclusion of the notwithstanding clause in § 124 other than the one I have offered: that it was included to override the Department’s misinterpretation of the Point Reyes Wilderness Act. The majority claims that the clause “has a clear function — to convey that prior legislation should not be deemed a legal barrier” to permit issuance. See Maj. op. at 1084-85. But that reading of the clause supports my position because the Secretary did treat “prior legislation” — namely, the Point Reyes Wilderness Act — as a “legal barrier” to permit issuance. As I have argued, that is exactly what the notwithstanding clause was intended to prohibit.
The majority also claims that I have not accorded the Secretary’s decision the deference it is owed under the arbitrary and capricious standard, which requires us to give due regard to an agency’s exercise of discretion within its sphere of expertise. See Maj. op. at 1088 n. 8. But I am not arguing here that the Secretary’s decision must be set aside because it reflects faulty weighing of permissible policy factors. We would have no authority to second guess a decision of that order. What I am saying, instead, is that § 124’s notwithstanding clause precluded the Secretary from basing his decision on the very misinterpretation of the Point Reyes Wilderness Act that Congress intended to override. A decision will normally be deemed arbitrary and capricious if an agency “has relied on factors which Congress has not intended it to consider.” Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). That, unfortunately, is just what the Secretary did.
In short, I would hold that Drakes Bay is likely to prevail on the merits of its APA claim. The Secretary’s misinterpretation of the Point Reyes Wilderness Act, and his mistaken view that denying the permit request effectuated Congress’s intent, were “fundamental” to his decision, rendering the decision “arbitrary, capricious, or otherwise not in accordance with law.” Safe Air for Everyone, 488 F.3d at 1101 (internal quotation marks omitted).
Ill
Like the majority, I will not spend much time addressing the remaining preliminary injunction factors — irreparable harm, balance of the equities, and the public interest. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Considered together, those factors tip in Drakes Bay’s favor.
Drakes Bay will suffer irreparable injury to its business and real-property rights if a preliminary injunction is erroneously *1099 denied. See, e.g., Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass’n, 840 F.2d 658, 661 (9th Cir.1988); Am. Passage Media Corp. v. Cass Commc’ns, Inc., 750 F.2d 1470, 1474 (9th Cir.1985). The loss of “an ongoing business representing many years of effort and the livelihood of its [owners] constitutes irreparable harm.” Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125-26 (2d Cir.1984) (per curiam).
The balance of equities favors Drakes Bay. The majority concludes otherwise by noting that Drakes Bay knew when it acquired the oyster farm that its permit would expire in 2012. Maj. op. at 1092-93. But that is not the relevant consideration. Rather, the controlling consideration is that the harm Drakes Bay will suffer from the erroneous denial of a preliminary injunction far outweighs .the harm the government will suffer from an erroneous grant of such relief. See Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1137-38 (9th Cir.2011); Scotts Co. v. United Indus. Corp., 315 F.3d 264, 284 (4th Cir.2002); Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd., 780 F.2d 589, 593 (7th Cir.1986); Roso-Lino, 749 F.2d at 126. The government will suffer only modest harm if oyster farming’s eighty-year history in the Estero continues a bit longer. But if a preliminary injunction is erroneously denied, Drakes Bay’s business will be destroyed. That is all Drakes Bay must show to demonstrate that the balance of equities tips in its favor here.
Finally, the public interest favors neither side. As the district court observed, federal judges are ill equipped to weigh the adverse environmental consequences of denying a preliminary injunction against the consequences of granting such relief, or the relative interests in access to Drakes Bay’s oysters as opposed to unencumbered wilderness. It is the equities that carry the day in this ease, see Nken v. Holder, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (when the United States is a party, equities and the public interest merge), and the equities strongly favor Drakes Bay.