[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10745

_____

SAVAGE SERVICES CORPORATION,
SAVAGE INLAND MARINE, LLC (UTAH),

 Plaintiffs - Counter-Defendants - Appellants,

*versus*

UNITED STATES OF AMERICA,

 Defendant - Counter-Claimant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:20-cv-00137-WS-N

_____

Before ROSENBAUM and JILL PRYOR, Circuit Judges, and ALTMAN,[*] District Judge.

ALTMAN, District Judge:

In the wake of the Exxon Valdez oil spill, which saw millions of gallons of oil pour into the waters off Alaska's coast, Congress passed the Oil Pollution Act of 1990 (the "OPA"). The OPA creates a comprehensive remedial scheme that governs—and apportions liability for—oil-removal costs. The statute holds oil spillers strictly liable *upfront* for oil-removal expenses and then carefully incentivizes their good behavior by allowing them, if they meet certain requirements, (1) to avail themselves of one of three liability defenses and (2) to seek contribution on the *back end* from other culpable parties.

In our case, the M/V SAVAGE VOYAGER was transporting oil through a Mississippi waterway when an accident at a boat lift—operated by the U.S. Army Corps of Engineers—caused a rupture in the SAVAGE VOYAGER's hull, through which thousands of gallons of oil poured into the river. Blaming the Government, the owners of the vessel sued the United States. Critically, though, they sued, not under the OPA, but under the common-law admiralty regime that has persisted for centuries. And, hoping to pierce the

---

[*] The Honorable Roy K. Altman, United States District Judge for the Southern District of Florida, sitting by designation.

Government's sovereign immunity, they relied on the Suits in Admiralty Act (the "SAA"), a 1920 law by which Congress generally waived sovereign immunity for most admiralty claims.

This case—hinging on the interplay between the OPA and the SAA—presents an issue of first impression in the federal courts. The district court dismissed the vessel owner's claims for *removal* costs in two steps. *First*, the court held that the OPA authorizes no claim against the Government for oil-removal damages. *Second*, it concluded that the OPA's comprehensive remedial scheme displaced the SAA's more general sovereign-immunity waiver. We agree and now affirm.

## BACKGROUND

### I.    The Spill

We start at the beginning—with an oil spill in the Tennessee-Tombigbee Waterway, a manmade system of canals, locks, and dams linking the Tennessee River in Mississippi with the Tombigbee River in Alabama. Here's a map of the Waterway:



On September 8, 2019, the M/V SAVAGE VOYAGER was pushing two tank barges along the Tennessee-Tombigbee Waterway.[1] Our Plaintiffs—Savage Services Corp. and Savage Inland

---

[1] Tank barges are non-self-propelled vessels that carry liquids—including oil.

Marine LLC—owned the vessel.[2] Along its journey, the vessel approached the Jamie Whitten Lock, a boat lift operated by the U.S. Army Corps of Engineers (the "Army Corps").

Things quickly devolved from there. On Savage's account, when the barge entered the lock, the lock master "began de-watering the lock chamber without notice or warning to the crew" and without "confirm[ing] the tug and tow were within the miter walls." At that point, the vessel's crew noticed that the "rake end" of one of the barges was caught on the north miter wall. The crew immediately relayed this information to the lock master. But, by then, it was too late. The lock chamber descended nearly sixty feet—and, as the water in the chamber fell, the barge rose out of the water until the angle became so steep that the barge fell off the miter wall. The weight of the barge caused the rake end of the barge to bend upward. According to Savage, the distorted rake "punctured a cargo tank . . . , resulting in a release of crude oil into the lock chamber." In the end, the barge looked like this:

---

[2] For simplicity's sake, we'll refer to Savage Services Corp. and Savage Inland Marine LLC (collectively) as "Savage."



Savage alleges that the Army Corps was "solely responsible" for the accident and that "[t]here was nothing the SAVAGE VOYAGER could have done to avoid the accident." Savage also says that, as a result of the Army Corps's sole negligence, Savage suffered $4 million in damages—mostly due to the time-consuming process of removing oil from the Waterway. Hoping to recover these costs, Savage sued the United States in admiralty, relying in large measure on the Suits in Admiralty Act of 1920. In the SAA, the United States waived its sovereign immunity for most admiralty claims. *See* 46 U.S.C. § 30903(a) ("In a case in which, . . . if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty *in personam* may be brought against the United States or a federally-owned corporation.").

## II.    The Federal Water Pollution Control Act

Before the Oil Pollution Act of 1990—the law that *now* governs oil-removal liability—there was the Clean Water Act, more formally known as the Federal Water Pollution Control Act Amendments of 1972 (the "FWPCA"). The FWPCA was the cornerstone of a fractured liability scheme. *See* J.B. Ruhl & Michael J. Jewell, *Oil Pollution Act of 1990: Opening a New Era in Federal and Texas Regulation of Oil Spill Prevention, Containment and Cleanup, and Liability*, 32 S. TEX. L. REV. 475, 481 (1991) ("The cornerstone of pre-OPA federal oil spill liability law was found in the Federal Water Pollution Control Act[.] Supplementing that central provision in specified, limited contexts were the Trans-Alaska Pipeline Authorization Act, the Deepwater Port Act of 1974, and the Outer Continental Shelf Lands Act[.]").

The default under the FWPCA was for the federal government to take the lead on oil-spill removal. In the event of an oil spill, the law authorized the President of the United States "to act to remove or arrange for the removal of such oil or substance at any time, unless he determines such removal will be done properly by the owner or operator of the vessel . . . from which the discharge occurs." 33 U.S.C. § 1321(c)(1) (1988).

As to liability, the FWPCA provided that the "owner or operator of any vessel from which oil . . . is discharged . . . shall . . . be liable to the United States Government for the actual costs . . . for the removal of such oil or substance by the United States

Government." *Id.* § 1321(f)(1). The vessel owner was strictly liable for those costs, subject to certain complete defenses. Those defenses allowed the owner to avoid liability by "prov[ing] that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) *negligence on the part of the United States Government*, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses." *Id.* (emphasis added). Remember the emphasized portion of this last sentence because it will become very important to our overall story. The United States could seek the "full amount" of its oil-removal costs if it could "show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner." *Id.* Otherwise, the owner's liability was capped by the vessel's typology and its size. *Id.*

On top of allowing *complete* defenses, the FWPCA left the door open for responsible parties to bring contribution claims against third parties: "The liabilities established by this section shall in no way affect any rights which . . . the owner or operator of a vessel . . . may have against any third party whose acts may in any way have caused or contributed to such discharge." *Id.* § 1321(h). The FWPCA also created a "revolving fund" to finance government-cleanup efforts: "[t]here is hereby authorized to be appropriated to a revolving fund to be established in the Treasury such sums as may be necessary to maintain such fund at a level of $35,000,000." *Id.* § 1321(k).

### III.    The Oil Pollution Act of 1990

Congress passed the Oil Pollution Act of 1990 in the aftermath of the Exxon Valdez oil spill, which had resulted in more than 11 million gallons of crude oil spilling into Alaska's waters. S. REP. NO. 101-99, at 1 (1989). After Exxon Valdez, Congress concluded that "the costs of spilling [oil] and paying for its clean-up and damage is not high enough to encourage greater industry efforts to prevent spills and develop effective techniques to contain them." S. REP. NO. 101-94, at 3 (1989). Congress also found fault in the "fragmented collection of Federal and State laws providing inadequate cleanup and damage remedies"—along with the "taxpayer subsidies to cover cleanup costs." *Id.* at 1. The FWPCA, Congress felt, "set[] inappropriately low limits of liability." *Id.* And its revolving fund was entirely inadequate: "Between 1971 and 1982 the United States Government obligated $124 million from the . . . revolving fund, but recovered only $49 million from spillers, for a total expenditure of $75 million in national funds. . . . [S]ince the fund is appropriated from the Treasury, it undercuts budget reduction goals and runs counter to cost internalization policies." *Id.* at 3. The "purpose" of the OPA was "to establish a comprehensive system of liability and compensation for damages caused by oil pollution," H.R. REP. NO. 101-242, pt. 2, at 31 (1989), and to "internalize those costs [associated with oil-spill cleanup] within the oil industry and its transportation sector," S. REP. NO. 101-94, at 2.

To effectuate those ends, the OPA—which amends the FWPCA[3]—sets out a comprehensive scheme that apportions liability for oil-cleanup costs and damages. For starters, the OPA defines the "responsible party" in any oil spill as the "person owning, operating, or demise chartering the vessel." 33 U.S.C. § 2701(32)(A). In the event of an oil spill, the OPA requires the executive branch to identify the responsible party. *Id.* § 2714(a) ("When the President receives information of an incident, the President shall, where possible and appropriate, designate the source or sources of the discharge or threat."). The responsible party is then strictly liable—at least in the first instance—for any oil-removal costs or damages: "Notwithstanding any other provision or rule of law, . . . each responsible party for a vessel . . . from which oil is discharged . . . is liable for the removal costs and damages . . . that result from such incident." *Id.* § 2702(a).

In exchange for this *initial* liability, the OPA offers vessel owners significant financial incentives to encourage them to fully perform their obligations. *First*, the OPA provides a *complete* defense to liability "if the responsible party establishes, by a preponderance of the evidence, that the discharge . . . of oil and the

---

[3] *See United States v. Am. Com. Lines, L.L.C.*, 759 F.3d 420, 422 (5th Cir. 2014) (noting that the "Clean Water Act ('CWA'), also known as the Federal Water Pollution Control Act ('FWPCA'), 33 U.S.C. [§] 1321, [was] amended by OPA"); *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 231 (D.D.C. 2007) (explaining that the "predecessor statute to the OPA [was] the Federal Water Pollution Control Act").

resulting damages or removal costs were caused solely by . . . (1) an act of God; (2) an act of war; (3) an act or omission of a third party . . . ; or (4) any combination of paragraphs (1), (2), and (3)." *Id.* § 2703(a). Note the conspicuous absence of the third clause we highlighted earlier—which allowed for a complete defense under the FWPCA in cases where *the federal government* was negligent. *Second*, the OPA establishes limitations on the responsible party's liability. The liability of the owner of a double-hull tank vessel weighing less than 3,000 gross tons, for example, would be limited to the greater of $1,900 per gross ton or $4 million. *Id.* § 2704(a). But these benefits (the complete defenses and the liability limits) are available to responsible vessel owners *only if* they "report the incident as required" and "provide all reasonable cooperation and assistance . . . in connection with removal activities." *Id.* §§ 2703(c), 2704(c)(2). The liability limits are unavailable if the responsible party's "gross negligence or willful misconduct" caused the spill. *Id.* § 2704(c)(1).

In addition to supplying complete defenses to liability, the OPA also allows—in a carefully worded provision—responsible vessel owners to seek contribution from *other* culpable parties: a "person may bring a civil action," the law says, "for contribution against any other person who is liable or potentially liable under this Act or another law." *Id.* § 2709. The statute defines the term "person" to mean "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a

State, or any interstate body." *Id.* at § 2701(27). This definition (notably) *does not* include the United States Government. *Id.*

Through the OPA, Congress created the Oil Spill Liability Trust Fund. The Fund's resources come from (among other things) (1) environmental taxes on crude oil and certain petroleum products and (2) government collections from specified environmental fines and penalties. 26 U.S.C. § 9509. The Fund works like an insurance pool: When a responsible party is entitled to a complete "defense to liability" or a "limitation of liability," the Fund will *both* reimburse the responsible party for payments made *and* cover any additional removal costs and damages. 33 U.S.C. § 2708(a). Similarly, if a responsible party fails to timely pay a claim for removal costs or damages, the entity that *does* pay those costs may present its claim for reimbursement to the Fund. *Id.* § 2713(a), (c) (noting that a claimant who first presents its claim to the responsible party may then "present the claim to the Fund" if the responsible party "denies all liability" or does not "settle[]" the claim "within 90 days").[4]

---

[4] *See generally* Cynthia M. Wilkinson *et al.*, *Slick Work: An Analysis of the Oil Pollution Act of 1990*, 12 J. ENERGY NAT. RES. & ENV'T L. 181, 207 (1992) ("The Federal Oil Spill Liability Trust Fund (Federal Fund), is available to pay for oil-spill related costs when the spiller cannot be identified, when the spiller can successfully defend against a charge of liability, when the spiller can invoke liability limits and claims exceed those limits, when the spiller is not subject to United States jurisdiction (a foreign spiller), or when a spiller is insolvent or otherwise cannot make good on its obligations under the OPA.").

## IV.    The District Court's Order

In response to Savage's amended complaint, the Government filed a partial motion to dismiss, contending that the United States has not waived its sovereign immunity for Savage's "spill removal cost claim." The Government didn't move to dismiss Savage's claims for *other* damages—*e.g.*, its claims for barge-repair, loss-of-use, and lost-cargo costs.[5] Savage, in turn, moved for partial summary judgment, seeking an affirmative ruling that the United States has waived its sovereign immunity as to those same oil-removal claims.

The district court granted the Government's motion to dismiss and denied Savage's motion for summary judgment. As the court put it: "Congress has enacted a specific, detailed statute assigning responsibility for oil-spill cleanup costs (at the initial payee level, and beyond) that lacks any waiver of sovereign immunity applicable to the events pleaded in the Amended Complaint." "In so doing," the district court held, "Congress has expressed its intent to effect an implied repeal of the general sovereign immunity provision in the [SAA] as it pertains to oil-spill cleanup damages." Savage timely appealed.

---

[5] The United States also filed a counterclaim for about $150,000 in "monitoring costs." The Government alleges that it incurred these costs "[i]n responding to this incident"—specifically, when "the U.S. Coast Guard closed the Tennessee-Tombigbee Waterway between mile markers 410 and 414 and established a Unified Command to direct cleanup efforts."

## STANDARD OF REVIEW

We review the district court's order granting the motion to dismiss and denying the motion for summary judgment *de novo*. *See Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1207 (11th Cir. 2018).

## DISCUSSION

This case is hard in part because (at least at first glance) it seems to fall squarely at the intersection between two well-established canons. On the one hand, we are "heirs to a system in which the sovereign, the king, was not amenable to suit." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 281 (2012) [hereinafter READING LAW]. Tracking that tradition, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). "Waivers of the Government's sovereign immunity, to be effective, must be unequivocally expressed." *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 33 (1992) (internal quotation marks omitted). Indeed, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity[.]" *F.A.A. v. Cooper*, 566 U.S. 284, 290 (2012).

On the other hand, "[c]ourts generally adhere to the principle that statutes relating to the same subject matter should be

construed harmoniously if possible, and if not, that more recent or specific statutes should prevail over older or more general ones." *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 941 (11th Cir. 2001) (quoting *S. Nat. Gas Co. v. Land, Cullman Cnty.*, 197 F.3d 1368, 1373 (11th Cir. 1999)). In other words, while recognizing that what's new and specific trumps what's old and more general, we've also warned that "[t]he conclusion that two statutes conflict . . . is one that courts must not reach lightly." *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1299 (11th Cir. 2010). "Courts must first 'assiduously attempt' to try to construe two statutes in harmony before concluding that one impliedly repeals the other." *Id.* (quoting *Tug Allie-B*, 273 F.3d at 952 (Black, J., concurring)). While this "canon is hardly absolute," a "doctrine of readily implied repealer would repeatedly place earlier enactments in doubt." READING LAW at 327–28.

The problem, as the parties present it, is that these presumptions pull (or *seem* to pull) in opposite directions in our case. The Government, guided by the presumption against waivers of sovereign immunity, says that the OPA sets out a comprehensive remedial scheme that *doesn't* allow responsible parties to sue the United States. Savage, by contrast, contends that the OPA, especially when read together with the SAA, *does* create a cause of action against the United States—or (alternatively) that it authorizes responsible parties to bring common-law admiralty claims against the federal government.

"In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). In our view, the OPA's text and structure squarely foreclose the kind of oil-removal claim Savage has advanced here.

## I.    The OPA Does Not Create a Cause of Action Against the United States

We begin with the easier call: the OPA doesn't create a cause of action for oil spillers to seek contribution from the United States. The OPA, recall, provides that "[a] person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law." 33 U.S.C. § 2709. The OPA defines "person" to include an "individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." *Id.* § 2701(27). As we've said, the United States is conspicuously absent from this list. Because the United States is not a "person" under the plain language of the statute—and since the contribution provision allows for contribution claims only against "any other *person*"—the OPA doesn't authorize Savage to seek contribution from the Government. And this plain-text reading of the statute is further strengthened by "our longstanding interpretive presumption that 'person' does not include the sovereign," *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780 (2000), a presumption that's at its acme in cases like ours "where the statute imposes a burden or

21-10745                Opinion of the Court                17

limitation, as distinguished from conferring a benefit or advantage," on the sovereign, *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979).

Pushing back, Savage argues that we should interpret the word "State" to include the United States because those terms are defined coextensively in the OPA.[6] Savage is right that the OPA provides one definition for both terms. It says:

> "United States" and "State" mean the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession of the United States[.]

33 U.S.C. § 2701(36). But this definition doesn't give us the answer Savage is hoping for. Instead, it does little more than explain that the "United States" and "States" are meant to include all U.S. *properties*—both those that are technically states and those that are just territories or protectorates. So, for example, when the OPA defines "onshore facility" to mean a facility on "any land within the United

---

[6] Savage also points us to the fact that the OPA allows responsible parties to pursue contribution actions against a "person" under "another law" and contends that "[c]learly 'another law' includes the SAA." Fair enough. But that doesn't answer the threshold question of whether the United States is a "person" that *can* be sued under "another law." It also fails to account for the OPA's "[n]otwithstanding" clause, 33 U.S.C. § 2702(a). *See infra* at Section III.B.

States," that includes facilities in Puerto Rico. *Id.* § 2701(24). And, when the OPA discusses "removal costs incurred by . . . a state," that includes losses incurred by Guam. *Id.* § 2702(b)(1). For several reasons, though, it would strain language and logic to conclude that, when Congress included "States" (but not "United States") within its definition of "person," it actually meant both individual states *and* the United States.

*First*, when Congress intended for a provision to apply to both the states and the United States, it referred to each separately—often pointing expressly to the "United States Government." *See, e.g.*, *id.* § 2706(a) ("In the case of natural resource damages . . . , liability shall be-- (1) to the United States Government for natural resources belonging to, managed by, controlled by, or appertaining to the United States [or] (2) to any State for natural resources belonging to, managed by, controlled by, or appertaining to such State[.]"); *id.* § 2712(f) ("Payment of any claim or obligation by the Fund under this Act shall be subject to the United States Government acquiring by subrogation all rights of the claimant or State to recover from the responsible party.").[7] Why would

---

[7] *See also, e.g.*, 33 U.S.C. § 2701(29) ("'public vessel' means a vessel owned or bareboat chartered and operated by the United States, or by a State or political subdivision thereof, or by a foreign nation, except when the vessel is engaged in commerce"); *id.* § 2702(b)(1)(A) ("removal costs" include "all removal costs incurred by the United States, a State, or an Indian tribe"); *id.* § 2702(b)(2)(A) ("damages" include damages to natural resources, "which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign

Congress have used the terms "United States" and "States" separately if they meant the same thing? It wouldn't have. Savage's interpretation collides head-on, then, with the surplusage canon, which cautions courts to "avoid a reading that renders some words altogether redundant." READING LAW at 176; *see also In Re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) ("This surplusage canon obliges us, whenever possible, to disfavor an interpretation when that interpretation would render a clause, sentence, or word superfluous, void, or insignificant." (cleaned up)).

*Second*, when Congress waived sovereign immunity in the contribution provisions of other statutes, it did so much more explicitly. Take, for instance, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA")—a strikingly similar statute with a modified strict-liability scheme for (non-oil-related) hazardous spills. CERCLA, like the OPA, defines "United States" and "State" together. *See* 42 U.S.C. § 9601(27) ("The terms 'United States' and 'State' include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has

---

trustee"); *id.* § 2702(b)(2)(D) ("damages" include lost tax revenues, "which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof"); *id.* § 2704(c)(3) (the owner or operator of an Outer Continental Shelf facility or vessel shall be liable for "all removal costs incurred by the United States Government or any State or local official or agency").

jurisdiction."). And, like the OPA, CERCLA provides that "[a]ny person may seek contribution from *any other person* who is liable or potentially liable." *Id.* § 9613(f)(1) (emphasis added). But, unlike the OPA, CERCLA plainly opens the United States up to liability in contribution by defining a "person" as including *both* the United States *and* the individual states. *Id.* § 9601(21) ("The term 'person' means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, *United States Government*, State, municipality, commission, political subdivision of a State, or any interstate body." (emphasis added)). Given how similar these two statutes (CERCLA and OPA) are, we think it extremely telling that, in the latter, Congress decided to *delete* the United States from the OPA's definition of "person[s]" who could be sued.

And CERCLA's not alone on this front. In crafting one provision of the Clean Water Act—housed in the same title of the Code as the OPA—Congress provided that "any citizen may commence a civil action on his own behalf . . . against any person . . . including . . . the United States"—again, unambiguously waiving its immunity with respect to civil actions. 33 U.S.C. § 1365(a). And the Resource Conservation and Recovery Act ("RCRA") says that "any person may commence a civil action on his own behalf . . . against any person, including the United States and any other governmental instrumentality or agency." 42 U.S.C. § 6972(a)(1)(B). Congress, in short, knows how to waive sovereign immunity when it wants to. And, unfortunately for Savage, it chose *not* to include

21-10745               Opinion of the Court                    21

these well-hashed sovereign-immunity waivers in the OPA. *See generally Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1262 (11th Cir. 2020) ("Where Congress knows how to say something but chooses not to, its silence is controlling." (quoting *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015))).

*Third*, courts are "especially reluctant to read 'person' to mean the sovereign where, as here, such a reading is 'decidedly awkward.'" *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 83 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989)). And there's no two ways about it: Savage's proposal to treat the United States as a "person" would lead to implausible results. For example, the OPA makes "[a]ny person" who fails to comply with certain "financial responsibility" requirements "liable to the United States for a civil penalty, not to exceed $25,000 per day of violation." 33 U.S.C. § 2617a(a). Savage's reading would thus make the United States liable *to itself* for civil sanctions. Imagine for a moment what that would look like: with the Environmental Torts Section of the Department of Justice working both sides of the same case at the same time—both prosecuting the United States for, and defending the United States against, those civil penalties. Given everything we've said thus far, there's no reason to believe that Congress intended for such an awkward result.

*Fourth*, in defining "person" under the OPA, Congress set out a careful list of governmental entities: States, municipalities,

political subdivisions of a State. 33 U.S.C. § 2701(27). But it didn't include the United States Government. The Supreme Court—invoking (though not by name) the canon of *expressio unius est exclusio alterius*—held (in a similar context) that, "[w]hile both [statutes at issue] define 'person' to cover States, subdivisions of States, municipalities, and interstate bodies . . . , neither statute defines 'person' to include the United States. Its omission has to be seen as a pointed one when so many other governmental entities are specified[.]" *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 617–18 (1992); *see also* NORMAN SINGER & SHAMBIE SINGER, 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:23 (7th ed. updated Nov. 2021) [hereinafter SUTHERLAND STATUTORY CONSTRUCTION] ("*Expressio unius* instructs that, where a statute designates a form of conduct, the manner of its performance and operation, and the persons and things to which it refers, courts should infer that all omissions were intentional exclusions.").

The OPA, in short, doesn't create a cause of action by which oil spillers can seek contribution from the United States for oil-removal costs.

## II. The OPA Does Not Provide a Complete Defense to Liability for Governmental Negligence

Nor does the OPA allow a responsible party to escape *all* liability by pointing to the federal government's negligence. As we've noted, "courts have held that the enumerated defenses of other strict liability schemes are exclusive and should be narrowly

construed." *Tug Allie-B*, 273 F.3d at 943 n.7 (collecting cases). The OPA, recall, provides a complete defense to liability "if the responsible party establishes, by a preponderance of the evidence, that the discharge . . . of oil and the resulting damages or removal costs were caused solely by . . . (1) an act of God; (2) an act of war; (3) an act or omission of a third party . . . ; or (4) any combination of paragraphs (1), (2), and (3)." 33 U.S.C. § 2703(a).

As this list makes pellucid, there's no *explicit* defense for negligence on the part of the federal government. And, while the OPA does reference "an act or omission of a third party," we simply cannot construe this exception to strict liability as including the United States. Why? Because a third party is a "party or person besides the two primarily concerned, as in a law case or the like." *Third Party*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/200849?redirectedFrom=third+party#eid (last visited Feb. 7, 2022); *see also Third Party*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "third party" as "someone other than the principal parties"). Looking at the OPA's design, it'd be hard to conclude that the first and second parties are anyone other than the responsible party (on the one hand) and the United States (on the other). The OPA, after all, divvies up—amongst those two "principal" parties—the liability for an oil spill, the responsibility for remedying an oil spill, and the authority for directing oil-spill cleanups.

And we're not alone in saying so. In *In re Glacier Bay*, 71 F.3d 1447 (9th Cir. 1995), the Ninth Circuit tackled a massive oil-spill action that had been brought under the FWPCA, the OPA's

predecessor. That statute, in detailing a spiller's rights against those "who caused or contributed to [the] discharge," provided that "[t]he liabilities established by this section shall in no way affect any rights which . . . the owner or operator of a vessel . . . may have against any *third party* whose acts may in any way have caused or contributed to such discharge." 33 U.S.C. § 1321(h) (emphasis added). And, like Savage, the owner of the oil tanker there contended "that the term 'third party' . . . may include the United States government." *Glacier Bay*, 71 F.3d at 1455. The Ninth Circuit made quick work of this argument:

> We cannot reconcile [the spiller's] reading with the structure of the statute. Read as a whole, [the FWPCA] sets out the rights and responsibilities of discharging vessel owners and the United States government vis-a-vis each other. These are the parties of the first and second parts. The term "third party" is used to refer [to] parties *other than* these two[.]

*Id*. We reach the same conclusion here.

The OPA's amendments to the FWPCA only further support our view that Congress removed governmental negligence as a complete defense to liability. As we've said, the FWPCA expressly allowed vessel owners to recover reasonable oil-removal costs from the United States if the "discharge was caused solely by (A) an act of God, (B) an act of war, (C) *negligence on the part of the United States Government*, or (D) an act or omission of a third party without regard to whether such act or omission was or was

not negligent, or of any combination of the foregoing causes." 33 U.S.C. § 1321(i) (emphasis added). The OPA—as the Government points out—reduced these complete defenses from four to three, eliminating the defense for "negligence on the part of the United States Government." *Id.* § 2703(a). The ineluctable inference we draw from this deletion is that Congress *intentionally* eliminated the erstwhile defense for governmental negligence.

Nonplussed, Savage argues that, even as Congress was removing the governmental-negligence defense, it tacitly (and simultaneously) restored that defense by transforming the United States into a "third party" under the third-party-defense clause. But there are several problems with this theory. For one thing, it violates the surplusage canon by needlessly forcing us to suppose that the FWPCA's governmental-negligence defense is (and long has been) redundant given the availability of the third-party defense. *Cf. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) ("[W]e have cautioned against reading a text in a way that makes part of it redundant."). For another, when "Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 359–60 (2016) (quoting *United States v. Quality Stores, Inc.*, 572 U.S. 141, 148 (2014)); *see also* READING LAW at 256 ("If the legislature amends or reenacts a provision . . . , a significant change in language is presumed to entail a change in meaning."). Savage, though, would have us conclude that, when Congress eliminated "negligence on the part of the United States Government" as a

defense, it never (actually) eliminated the governmental-negligence defense. In fact, Savage would have us believe that Congress's amendment did nothing at all. That can't be right. A third problem with Savage's construction is that it flouts the dispositive English-usage problems the Ninth Circuit identified almost thirty years ago. *See In re Glacier*, 71 F.3d at 1455 (observing that "discharging vessel owners and the United States government . . . are the parties of the first and second parts" and that, as a result, "third party" could *not* refer to the United States).

For all these reasons, we conclude that the OPA includes no complete defense for governmental negligence.

## III.    The OPA is Exclusive

So where does that leave us? The SAA "broadly waives the Government's sovereign immunity" for admiralty claims. *Henderson v. United States*, 517 U.S. 654, 656 (1996); *see also Kasprik v. United States*, 87 F.3d 462, 465 (11th Cir. 1996) ("The SAA does not provide a cause of action against the United States but rather constitutes the United States' limited waiver of sovereign immunity with respect to admiralty suits."). And the OPA, as we've now learned, is a specific statute that governs liability for oil-spill

removals and which does *not* create a right of action for suits against the United States.[8] But that's really only half the problem.

The heart of the parties' disagreement lies here—on this question: is the OPA *exclusive*? Savage maintains that, even if the OPA may not *itself* contain a waiver of sovereign immunity, vessel owners may still go after the United States for removal costs and damages by bringing common-law admiralty claims against the Government pursuant to the SAA's sovereign-immunity waiver. The Government, for its part, contends that the OPA provides a comprehensive—and exclusive—remedy for oil-spill-removal claims, displacing any cause of action Savage could've brought under the common law (or the SAA). We think the Government has the better side of this argument.

### A. A Detailed Statute Preempts General Remedies

As an initial matter, our analysis is governed by "the well-established principle that, in most contexts, 'a precisely drawn, detailed statute pre-empts more general remedies.'" *Hinck v. United States*, 550 U.S. 501, 506 (2007) (quoting *EC Term of Years Tr. v.*

---

[8] We'd note, by the way, that the only courts to have considered *this* question—whether the Government waived its sovereign immunity under the OPA—have agreed that the OPA contains no such waiver. *See Rick Franklin Corp. v. U.S. Dep't of Homeland Sec.*, 2008 WL 337978, at *3 (D. Or. Feb. 4, 2008) ("The OPA does not contain a waiver of the government's sovereign immunity from suit."); *Int'l Marine Carriers v. Oil Spill Liab. Tr. Fund*, 903 F. Supp. 1097, 1102 (S.D. Tex. 1994) ("Nothing in OPA section[s] 2712, 2713, or 2715 can be construed as a waiver of sovereign immunity.").

*United States*, 550 U.S. 429, 433 (2007)). The Supreme Court has held, for instance, that "whe[re] Congress enacts a specific remedy . . . when previous remedies were 'problematic,' the remedy provided is generally regarded as exclusive." *Id.* (quoting *Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 285 (1983)). And that makes sense: when the legislature has attacked a specific problem—and crafted a detailed and precise remedy to address that problem—we should generally assume that the law represents Congress's considered and exclusive judgment on that issue.

Imagine a local municipality that promulgates two ordinances. The first provides a cause of action for trespass against any *person* who encroaches on private land. The second provides a cause of action for trespass against any *police officer* and outlines a limited set of circumstances in which the cause of action may be asserted—*e.g.*, only when the officer was operating outside of his jurisdiction, was off duty, or was acting in violation of constitutional constraints. We think it beyond peradventure to say that a plaintiff in our city looking to sue a *police officer* for trespass could assert a claim only under the latter (more specific) ordinance—and not under the general trespass law. Otherwise, what purpose would the second ordinance serve?

And that's pretty much what happened here. In 1990, Congress enacted a detailed—and precisely drawn—statute that governed almost every aspect of an oil-spill cleanup. As we've explained, the OPA assigns initial liability to the vessel owner, 33 U.S.C. § 2702; places caps on—and offers complete defenses to—

that liability for parties who act responsibly, *id.* §§ 2703, 2704; outlines the contours of available contribution claims, *id.* § 2709; creates an industry-financed Fund to limit the burden on taxpayers, *id.* § 2712; and assigns jurisdiction, venue, and time limitations for claims arising under the statute, *id.* § 2717. Congress didn't draw up this carefully balanced design—a veritable super-structure of oil-cleanup rights, duties, and obligations—for no reason. It did it to strike the right incentives within the oil industry itself—incentives the previous regime had, in Congress's estimation, failed to drive home. This detailed scheme thus preempts the general oil-removal remedies that might've been available under either the common law or the SAA.

In similar circumstances, courts have routinely reached this same conclusion. Take *United States v. Bormes*, 568 U.S. 6 (2012), for instance. There, the plaintiff sued the government under the Fair Credit Reporting Act. In doing so, the plaintiff attempted to invoke a waiver of sovereign immunity from a different statute, the Little Tucker Act. The Little Tucker Act, like the SAA, doesn't create a cause of action against the federal government—but only waives sovereign immunity for certain "claim[s] against the United States, not exceeding $10,000." 28 U.S.C. § 1346(a)(2). Given the comprehensiveness of the FCRA's remedial scheme, the Supreme Court refused to allow the plaintiff to sue the United States. In this way, it recognized—as we do—that "a precisely drawn, detailed statute pre-empts more general remedies." *Bormes*, 568 U.S. at 12–13. It then found that the FCRA created just such a "detailed

remedial scheme" because its provisions "set out a carefully circumscribed, time-limited, plaintiff-specific cause of action," "precisely define the appropriate forum," prescribe "a specified limitations period," and vest "jurisdiction" in certain courts. *Id.* at 15 (cleaned up). It concluded:

> [O]ur precedents collectively stand for a more basic proposition: Where a specific statutory scheme provides the accoutrements of a judicial action, the metes and bounds of the liability Congress intended to create can only be divined from the text of the statute itself. . . . Since FCRA is a detailed remedial scheme, only *its own* text can determine whether the damages liability Congress crafted extends to the Federal Government. To hold otherwise—to permit plaintiffs to remedy the absence of a waiver of sovereign immunity in specific, detailed statutes by pleading general Tucker Act jurisdiction—would transform the sovereign-immunity landscape.

*Id.* at 14–15.

Our case is just the same. The OPA is a "detailed remedial scheme" that "provides the accoutrements of a judicial action." It carefully balances (and neatly circumscribes) liability for oil-removal claims. *See generally* 33 U.S.C. §§ 2702, 2703, 2704, 2709. It mandates time limits for bringing covered claims under the statute. *Id.* § 2717(f) (prescribing a three-year statute of limitations for "an action for damages under this Act," "[a]n action for recovery of

removal costs," an "action for contribution for any removal costs or damages," and an "action based on rights subrogated pursuant to this Act"). It precisely defines the forum in which any such action must be brought, noting that "[v]enue shall lie in any district in which the discharge or injury or damages occurred, or in which the defendant resides, may be found, has its principal office, or has appointed an agent for service of process." *Id.* § 2717(b). And it lists the courts that may lawfully exercise subject-matter jurisdiction over its claims, providing (for instance) that "the United States district courts shall have exclusive original jurisdiction over all controversies arising under this Act, without regard to the citizenship of the parties or the amount in controversy." *Id.* Like the statute at issue in *Bormes*, then, the OPA is a "detailed remedial scheme" that constitutes the exclusive source of liability for oil-removal claims. Whether oil-spill liability extends to the federal government, in other words, must be determined by the OPA's *own text*.[9]

---

[9] There is, it's true, one difference between our case and *Bormes*—one neither party seems to notice. In *Bormes*, the plaintiff brought his case under the FCRA and attempted to "mix and match" its FCRA cause of action with the Little Tucker Act's sovereign-immunity waiver. Our Plaintiff, by contrast, doesn't assert any claim under the OPA. Instead, it advances a claim under federal maritime law and relies on the SAA for its waiver of sovereign immunity—something it unquestionably *can* do as a general matter. This, though, is a difference without much significance—at least for our purposes. That's because *Bormes* turned on the longstanding (and broader) rule that a precisely drawn and detailed statutory scheme preempts an older, more-general set of remedies. And that's exactly what happened in our case: once the precisely

Or take the Supreme Court's decision in *Brown v. General Services Administration*, 425 U.S. 820 (1976). That case required the Court to decide whether Title VII of the Civil Rights Act of 1964 "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Id.* at 821. After a deep-dive into the law and its history, the Court determined that the "structure of the [statute] fully confirms the conclusion that Congress intended it to be exclusive and pre-emptive." *Id.* at 829. In reaching this result, the Court pointed to the "balance, completeness, and structural integrity" of the statutory scheme and noted that the law "proscribes federal employment discrimination and establishes an administrative and judicial enforcement system," which includes—for instance—"certain preconditions" (like EEOC exhaustion). *Id.* at 832.

The OPA does all of those things. As we've said, it prescribes *where* to sue and *when*. 33 U.S.C. § 2717. But it does much more than that: It sets out a detailed "[c]laims procedure" that governs actions against responsible parties, requiring that (other than in limited circumstances) "all claims for removal costs or damages shall be presented first to the responsible party" before the claimant can present its claim in court or to the Fund in a manner approved by the President. *Id.* § 2713(a), (e); *see generally* 33 C.F.R. § 136.105 (setting out the "[g]eneral requirements for a claim" under the

---

drawn—and detailed—OPA came into being, plaintiffs like Savage could no longer invoke general maritime law (in conjunction with the SAA) to create a cause of action for oil-removal costs against the federal government.

21-10745                Opinion of the Court                    33

OPA). On Savage's view, however, a claimant can avoid all of these steps by simply asserting its claims under general admiralty law in federal court. To quote the Supreme Court: "[i]t would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." *Brown*, 425 U.S. at 833.

### B.  The "Notwithstanding" Clause

The OPA's text—always a good place to start and end—likewise suggests that the law's remedial scheme is exclusive. *Cf.* READING LAW at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). In assigning liability, the very first (substantive) provision of the OPA says:

> *Notwithstanding any other provision or rule of law*, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that result from such incident.

33 U.S.C. § 2702(a). We've previously held that a "notwithstanding" clause is "Congress's indication that the statute containing that language is intended to take precedence over any preexisting or subsequently-enacted legislation on the same subject."

*Miccosukee*, 619 F.3d at 1298 (cleaned up) (quoting *Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1337 (11th Cir. 2006)).[10] Of course, such a clause "must be read in the context of the entire statute." *Id.* at 1300. But, for all the reasons we've outlined, we think *that* context—from the detailed remedial scheme, to the specific attention to oil removal, to the problems Congress intended to fix—supports our reading of the OPA's exclusivity.

Savage disagrees. In its view, the OPA's "savings" clause leaves available to responsible parties certain alternative causes of action, not found in the OPA—like, for instance, the common-law maritime claims Savage has advanced here. The OPA's savings clause is fairly straightforward. It reads: "Except as otherwise provided in this Act, this Act does not affect . . . admiralty and maritime law." 33 U.S.C. § 2751(e). Relying on *dicta* from a district-court decision in Louisiana, Savage contends that, through the OPA's savings clause, Congress intended to "preserve[] existing maritime law except where OPA contains a specific provision *to the contrary*." *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mex., on Apr. 20, 2010*, 496 F. Supp. 3d 989, 1001 (E.D. La. 2020). The *Deepwater Horizon* Court reached this conclusion (which it notably

---

[10] It's worth focusing on that language for a moment. The OPA says that a responsible party "is liable for the removal costs and damages" provided for under the Act, "[n]otwithstanding any other provision or rule of law, and subject to the provisions of this Act[.]" 33 U.S.C. § 2702(a). If Savage could escape liability under *another* "provision or rule of law," *see supra* at note 6, this language would be reduced to meaning nothing at all. We don't read statutes that way.

described as "dicta" and characterized as "not part of the Court's holding") by relying on a congressional Conference Report, in which the Conference Committee had described the savings clause to mean that "there is no change in current law unless there is a *specific* provision to the contrary." *Id.* at 1000 (emphasis added) (quoting H.R. REP. NO. 101-653 (1990) (Conf. Rep.)).

There are a few things to say about this. *First*, "legislative history is not the law," and "even those of us who believe that clear legislative history can illuminate ambiguous text won't allow ambiguous legislative history to muddy clear statutory language." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (cleaned up); *see also Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) ("There are, we recognize, contrary indications in the statute's legislative history. But we do not resort to legislative history to cloud a statutory text that is clear."); *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc) ("When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language."); Alexander Hamilton, Final Version of an Opinion on the Constitutionality of an Act to Establish a Bank, *in* 8 THE PAPERS OF ALEXANDER HAMILTON 97, 111 (Harold C. Syrett ed., 1965) (Feb. 23, 1791) ("[W]hatever may have been the intention of the framers of a constitution, or of a law, that intention is to be sought for in the instrument itself[.]").

*Second*, the text of the OPA *is* unambiguous. After all, "except as otherwise provided" *does not* mean, as the *Deepwater*

*Horizon* Court supposed, "except as *specifically* provided otherwise" (whatever that might mean). And the fact is that the OPA *has* "provided otherwise." The OPA is a detailed and comprehensive framework for apportioning oil-spill liability. Through its many parts, Congress chose *not* to afford vessel owners any cause of action against the United States. Quite the contrary: It eliminated, as we've said, a provision—present in the OPA's predecessor statute—that would've allowed vessel owners to skirt liability in the case of governmental negligence. And it strayed from similar statutory schemes (like CERCLA and RCRA) that expressly allow for contribution claims against the federal government. The plain import of these unambiguous decisions, then, is that Congress *has* provided otherwise—by making clear that the Government is *not* liable for oil-removal costs. And at least one of our sister circuits has adopted this commonsense interpretation of the law—*viz.*, that the OPA's savings clause "shows that the admiralty claims that are preserved are those that are not addressed in the OPA." *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 351 (5th Cir. 2017).

An everyday example might help us clarify this point. Your friend, who's organizing a picnic, sends a group of people some rules, including this one: "Except as otherwise provided in this text message string, you can bring a sandwich to the picnic." Just before the picnic, your friend texts the group a second rule: "You can bring a turkey bacon sandwich if it has lettuce, tomatoes, and onions." If you arrive at the picnic with a turkey bacon sandwich that has *nothing* on it—*i.e.*, *no* lettuce, tomatoes, and onions—have you

violated your friend's rules? Under the tenets of ordinary English usage, it would sure seem so. And the same common English usage dictates the result here. Our statute says (in effect): "You can assert a contribution claim if you bring it against a 'person.'" If you bring a contribution claim against *not* a person—against the United States, for example—you've violated the obvious import of the statute. *Cf.* READING LAW at 107 ("When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is not available to purchasers with spotty credit.").

### C. Other Circuits

While the interplay between the OPA and the SAA presents an issue of first impression across the federal courts, we're not painting on a blank canvas. That's because our sister circuits have universally concluded that the OPA embodies the exclusive remedy for oil-removal claims that fall within the statute's ambit. In *United States v. American Commercial Lines, L.L.C.*, 759 F.3d 420 (5th Cir. 2014), for example, the Fifth Circuit held that the OPA's "balanced and comprehensive remedial scheme provides the exclusive remedy for a claimant to recover statutory removal costs from a responsible party." *Id.* at 425. Why? Because, "when Congress enacts a carefully calibrated liability scheme with respect to specific remedies, 'the structure of the remedies suggests that Congress intended for the statutory remedies to be exclusive.'" *Id.* at 424 (quoting *United States v. M/V BIG SAM*, 681 F.2d 432, 441 (5th Cir. 1982)). The OPA meets each of those criteria.

Nor is the Fifth Circuit alone in saying so. *See S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58 (1st Cir. 2000). In *South Port Marine*, the First Circuit embarked on "a straightforward inquiry into whether Congress intended the enactment of the OPA to supplant the existing general admiralty and maritime law, which allowed punitive damages under certain circumstances in the area of oil pollution" and "conclude[d] that Congress did so intend." *Id.* at 65; *see also id.* ("Congress intended the OPA to be the exclusive federal law governing oil spills[.]" (cleaned up)). Starting with "the text of the statute itself," the court found that the "scheme is comprehensive." *Id.* "We think," it said, "that the OPA embodies Congress's attempt to balance the various concerns at issue, and trust that the resolution of these difficult policy questions is better suited to the political mechanisms of the legislature than to our deliberative process." *Id.* at 66. We agree and thus reject Savage's attempt to have us disturb the comprehensive scheme Congress created—and to tip the careful balance Congress designed. *See also Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 139 (1st Cir. 2017) ("[W]e acknowledged in *South Port Marine* that the OPA supplants general admiralty and maritime law when the OPA is triggered[.]").

And those decisions are just the tip of the iceberg. Long before the OPA was on anyone's radar, courts—including the Supreme Court—had held that the FWPCA (the OPA's predecessor) constituted the exclusive remedy for removal costs and damages. In the Supreme Court's words:

> Congress' intent in enacting the [FWPCA] was clearly
> to establish an all-encompassing program of water
> pollution regulation. *Every* point source discharge is
> prohibited unless covered by a permit, which directly
> subjects the discharger to the administrative appa-
> ratus established by Congress to achieve its goals. The
> "major purpose" of the [FWPCA] was "to establish
> a *comprehensive* long-range policy for the elimina-
> tion of water pollution." S. REP. NO. 92-414, at 95. No
> Congressman's remarks on the legislation were com-
> plete without reference to the "comprehensive" na-
> ture of the [FWPCA].

*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 318 (1981)
(holding that the FWPCA displaced a common-law nuisance
claim);[11] *see also, e.g.*, *United States v. Dixie Carriers, Inc.*, 627 F.2d

---

[11] To the extent it matters, that same legislative history—emphasizing the
comprehensiveness of the legislation—dominates the OPA. *See, e.g.*, S. REP.
NO. 101-94 (stating that the OPA "builds upon section 311 of the Clean Water
Act to create *a single Federal law* providing cleanup authority, penalties, and
liability for oil pollution" (emphasis added)); H.R. REP. NO. 101-242, pt. 2, at
31 ("The purpose of this legislation is to establish a comprehensive system of
liability and compensation for damages caused by oil pollution[.]"); 135 CONG.
REC. S9690 (daily ed. Aug. 3, 1989) (statement of Sen. Baucus) (referring to
"[t]his comprehensive bill"); 135 CONG. REC. H7894 (daily ed. Nov. 1, 1989)
(statement of Rep. Quillen) (calling the OPA a "much needed comprehensive
oilspill bill"); 136 CONG. REC. S11536 (daily ed. Aug. 2, 1990) (statement of Sen.
Mitchell) ("As the author of the Senate bill, I am pleased we are finally enacting

736, 737 (5th Cir. 1980) ("[W]e conclude that Congress intended for the Federal Water Pollution Control Act (FWPCA) to provide the exclusive legal remedy for the government to recover its oil spill cleanup costs[.]"); *Steuart Transp. Co. v. Allied Towing Corp.*, 596 F.2d 609, 618 (4th Cir. 1979) ("We therefore conclude that [the FWPCA] was designed to replace, rather than to supplement, the judicial remedies developed in the absence of a comprehensive statute. Since the judicial remedies are inconsistent with the statute, the statute provides the sole means for the federal government to recover oil removal costs.").[12]

---

a tough, comprehensive bill."); *cf.* Patrick Nash, *The Adequacy of the Oil Pollution Act's Compensation Scheme in the Case of a Catastrophic Oil Spill*, 7 J. MIN. L. & POL'Y 105, 108 (1991) ("As was the case with the floor debate for FWPCA, the floor debate regarding OPA was replete with redundant exclamations of 'comprehensive[ness].'").

[12]    Savage insists that the Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), suggests otherwise. There, the Court held that the "[FWPCA]'s penalties for water pollution . . . [do not] preempt the common law punitive-damages remedies at issue here." *Id.* at 488. For three reasons, *Baker* is inapposite.

First, the FWPCA addressed the "actual costs incurred . . . for the removal of such oil or substance by the United States Government." 33 U.S.C. § 1321(f) (1998). But it didn't address the punitive-damages remedies the Court refused to strike down in *Baker*. The OPA, by contrast, governs the very sort of costs Savage incurred in this case—including, for instance, "all removal costs," "[d]amages for injury to . . . natural resources," "[d]amages for injury to . . . real or personal property," and "[d]amages for loss of subsistence use of

21-10745                Opinion of the Court                41

And, as the Supreme Court has explained, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also Keene Corp. v. United States*, 508 U.S. 200, 212 (1993) ("[W]e apply the presumption that Congress was aware of these earlier judicial interpretations and, in effect, adopted them."). We can assume, in other words, that, when it enacted the OPA in 1990, Congress knew that courts—including the U.S. Supreme Court—had routinely interpreted the FWPCA as providing the exclusive

---

natural resources." 33 U.S.C. § 2702(b). As to the kinds of damages it actually covers, in other words, the OPA *is exclusive.*

*Second*, *Baker* noted that the FWPCA has a "saving clause reserving 'obligations . . . under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil.'" *Baker*, 554 U.S. at 488 (quoting 33 U.S.C. § 1321(o)). But our savings clause is materially different because it *doesn't* broadly reserve pre-existing property claims. Instead, it prefaces any "savings" with the crucial phrase: "[e]xcept as otherwise provided in this Act," 33 U.S.C. § 2751(e)—a phrase that didn't appear in the FWPCA. And, as we've said, Congress *has* provided otherwise in the OPA by foreclosing any oil-removal claims against the Government.

*Third*, as *Baker* rightly observed, it's "hard to conclude that a statute expressly geared to protecting 'water,' 'shorelines,' and 'natural resources' was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and livelihoods of private individuals." *Baker*, 554 U.S. at 488–89. Here, the equities are just the reverse: it'd be hard to conclude that a statute geared to shifting oil-pollution costs from the taxpayer to the oil industry would allow the oil industry to turn around and recover those same costs from the taxpayer. *Baker*, in short, is neither here nor there.

remedy for removal costs. If Congress thought these interpretations were wrong, it could've easily corrected the error by making clear that the OPA was *not* to be similarly construed. But it didn't—precisely because Congress agreed, as we do, that the OPA (like the FWPCA before it) provides the *exclusive* remedy for oil-removal costs.

### D. Policy

Still resisting, Savage says that it would be unfair "to protect the Government from the consequences of its decisions when acting . . . as a tortfeasor that causes millions of dollars of property damage and environmental cleanup costs." Two thoughts on this. *First*, it simply isn't our place to second-guess the legislature's fairness determinations or to supplant its considered judgment with our own. *See Mamani v. Berzain*, 825 F.3d 1304, 1310 (11th Cir. 2016) ("[U]nless and until the first and third branches of government swap duties and responsibilities, we cannot rewrite statutes."). *Second*, there's plenty of reason to believe that the first branch *did* hope to narrowly tailor the taxpayer's burden in the event of an oil spill. The OPA, after all, puts the vessel owner first in line to pay any removal costs. 33 U.S.C. § 2702. It also employs a Fund—financed largely by taxes and penalties on the oil industry—to cover, among other things, excess costs and damages. *Id.* § 2712. And it raised the limits on oil-spill liability. *Id.* § 2704. To the extent we can divine some congressional purpose from these decisions, it would appear that one (primary) purpose was to force the oil industry to internalize the negative externalities of its business—

21-10745                 Opinion of the Court                         43

*i.e.,* to incentivize the oil industry to avoid financially and environmentally costly oil spills in the first instance.

Relying on legislative history, Savage maintains that the OPA was not meant to permanently shift liability from the Government to a vessel owner—but simply (in Savage's words) to "close[] a loophole in the patchwork of predecessor statutes whereby the owner of a vessel leaking oil could deny liability long enough to force the Government to coordinate and fund the emergency response to a fast-expanding environmental disaster[.]" As we've said, however, we needn't wade into the murky waters of the statute's legislative history because "a law is the best expositor of itself." *Pennington v. Coxe*, 6 U.S. 33, 52 (1804) (Marshall, C.J.).[13] And, through the OPA, Congress exposited itself rather clearly.

_____

[13] Even if we were to accept Savage's invitation, we think *that* history may well tell a different story. Congress enacted the OPA in the wake of "[t]he 11-million gallon spill from the Exxon Valdez in Prince William Sound, Alaska, and the three spills within a 24-hour period just months later in the coastal waters of Rhode Island, the Delaware River and the Houston Ship Channel." S. REP. NO. 101-94, at 2. Congress concluded that those "four major oil spills within a three-month period suggest that spills are still too much of an accepted cost of doing business for the oil shipping industry" and that "the costs of spilling and paying for its clean-up and damage is not high enough to encourage greater industry efforts to prevent spills and develop effective techniques to contain them." *Id.* at 3. "Sound public policy," Congress made clear, "requires reversal of these relative costs." *Id.*

And the then-extant federal laws weren't doing the trick. The Senate Report noted that, "[b]etween 1971 and 1982 the United States Government

## IV.    Implied Repeal

Which takes us back to where we started. Savage sees this case through the lens of the repeal-by-implication doctrine, which instructs that "[c]ourts must first 'assiduously attempt' to try to construe two statutes in harmony before concluding that one impliedly repeals the other." *Miccosukee*, 619 F.3d at 1299 (quoting *Tug Allie-B*, 273 F.3d at 952 (Black, J., concurring)).

We very much doubt that this implied-repeal lens is the right way to view our case. The Supreme Court has recognized that "the expectation that there would be some expression of an intent to 'repeal' is particularly strong in a case . . . in which the 'repeal' would extend to virtually every case to which the statute had application." *United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 169 (1976). But the converse is also true: when a highly specific statute narrowly displaces a general one, it's not at all clear that the presumption against implied repeal applies. *See Harris v. Owens*,

---

obligated $124 million from the Clean Water Act's section 311(k) revolving fund, but recovered only $49 million from spillers, for a total expenditure of $75 million in national funds." *Id.* The Report also signaled Congress's intent to move away from "taxpayer subsidies to cover cleanup costs" and towards "internaliz[ing] those costs within the oil industry and its transportation sector." *Id.* at 2. By shifting the burden of cleanup costs onto the oil industry—and by precluding the oil industry from seeking contribution payments from the Government (read: taxpayers)—the OPA seems to further, rather than to frustrate, each of these objectives.

264 F.3d 1282, 1296 (10th Cir. 2001) ("The later statute simply addresses one particular application and carves out an exception. We see no repeal-by-implication problem."); *see also* 1A SUTHERLAND STATUTORY CONSTRUCTION § 23:16 ("Where a later special or local statute is not irreconcilable with a general statute to the degree that both statutes cannot have a coincident operation, the general statute is not repealed, and the special or local statute exists as an exception to its terms."); READING LAW at 183 (explaining that, under the general/specific canon, "the specific provision is treated as an exception to the general rule"). The reasoning behind this interpretive canon is sound: When Congress undermines an *entire* statute, we tend to view that statute as *repealed*, and we generally expect Congress to *say* that it intended so drastic a result. But when the legislature merely carves out a narrow exception to an old provision by addressing a discrete sub-issue in the original statute—think: a law specifically targeting the Carolina northern flying squirrel against the backdrop of the Endangered Species Act—it's not at all clear that the legislature is *repealing* anything. And, in this circumstance at least, we wouldn't necessarily expect Congress to *say* that it was.[14]

---

[14] Here's a hypothetical to bring this point home. Imagine a scenario in which Congress repealed the OPA tomorrow—thus ridding the U.S. Code of the OPA's detailed (and exclusive) framework for oil-removal claims. Wouldn't vessel owners (like Savage) then be able to bring common-law oil-removal claims against the United States under the SAA's general provisions? We don't see why not. And, if that's right, then it seems clear that Congress didn't *repeal*

The OPA is a lot like the Carolina-northern-flying-squirrel statute we just invented—and the SAA serves as a useful substitute for the Endangered Species Act. For starters, the SAA broadly applies to admiralty claims against the Government. It governs, for instance, when a passenger on a "boat [is] swept over a dam" and injured due to the "failure of the Corps of Engineers to post properly located signs warning water craft of the dam." *Beeler v. United States*, 338 F.2d 687, 688 (3d Cir. 1964). Or when a "longshoreman" falls through the "pad-eye" of a public vessel. *Grillea v. United States*, 232 F.2d 919, 922 (2d Cir. 1956) (Hand, J.). Or when someone "tubing on the Missouri River . . . alide[s] with a submerged buoy placed in the river by the United States Coast Guard." *Harrell v. United States*, 443 F.3d 1231, 1234 (10th Cir. 2006) (cleaned up). Or when a "seaman" for the Coast Guard returns to a drydock late at night and—"in the condition for which seamen are famed"—turns some valves and sinks the drydock. *Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167, 169 (2d Cir. 1968) (Friendly, J.). Or any of the other countless claims that might arise on the sea.[15] The OPA, covering a mere subset of admiralty

---

any part of the SAA when it promulgated the OPA—because, if it had, there'd be no SAA to revert to once the OPA was erased. *Cf.* READING LAW at 334 ("When a statute is repealed, it falls irretrievably into oblivion. It is not half-buried in expectation of resurrection. Hence a repeal of a repealer does not revivify the statutory corpse.").

[15] Including, by the way, cases just like ours. The Government doesn't disagree, remember, that Savage *can* pursue its common-law claim against the

21-10745                Opinion of the Court                47

claims—*viz.*, those involving oil-spill liability—addresses only a *small* piece of that much larger maritime mosaic. Far from repealing the SAA, then, the OPA simply carves out a narrow exception that governs only one of the SAA's many applications. We thus wouldn't really expect Congress to say that the OPA "repealed" anything at all.[16]

United States for costs that fall beyond the OPA's grasp—things like damage to the barge, loss of use, and lost cargo.

[16]    Even if Savage were right that the Government's position amounts to a contention that the OPA impliedly repealed the SAA (to some limited extent), that implied repeal wouldn't save Savage here. Courts have long held that "Congress's intent to effect an implied repeal can be inferred when a later statute conflicts with or is repugnant to an earlier statute; or when a newer statute covers the whole subject of the earlier one, and clearly is intended as a substitute." *Miccosukee*, 619 F.3d at 1299; *see also King v. Cornell*, 106 U.S. 395, 396 (1882) ("While repeals by implication are not favored, it is well settled that where two acts are not in all respects repugnant, if the later act covers the whole subject of the earlier, and embraces new provisions which plainly show that the last was intended as a substitute for the first, it will operate as a repeal.").

Our decision in *Tug Allie-B* is on point. In that case, a commercial tugboat "ran aground and collided with coral reefs in the vicinity of Ledbury Reef in Biscayne National Park." *Tug Allie-B*, 273 F.3d at 936. The vessel owner filed a claim under the Limitation of Liability Act, which "limits a vessel owner's liability for any damages arising from a maritime accident to the post-accident value of the vessel and its pending freight." *Id.* at 939. The United States filed a counterclaim under the Park System Resources Protection Act (the "PSRPA"), "claiming that, pursuant to the PSRPA, it was entitled to all damages due to injuries to resources in the National Park as a result of the grounding." *Id.* Looking to the language of the statutes, this Court found that,

48                      Opinion of the Court                    21-10745

Other courts have tackled the repeal-by-implication doctrine in precisely this way. Take the Fourth Circuit's ruling in *Strawser v. Atkins*, 290 F.3d 720 (4th Cir. 2002). That case arose out of litigation between several U.S. states and most of the major tobacco companies. After the states and the tobacco companies settled, a class of Medicaid recipients who had received medical assistance for tobacco-related complications sued the states, contending that the "usual provisions for distribution of Medicaid recoveries [under 42 U.S.C. § 1396k(b)] apply to the funds the states receive from the [settlement agreement], so that . . . they have a federal right to a share of those funds." *Id.* at 728. On appeal, the Fourth Circuit

---

"in the absence of any explicit statutory language limiting damages under the PSRPA, . . . Congress contemplated that the Government could seek full recovery under the statute for accidents causing injury to park lands." *Id.* at 942. On the other hand, the Limitation of Liability Act "provides for a limitation on the total of all recoverable damages in a marine accident." *Id.* In light of this "conflict," we applied the PSRPA—which had no cap on damages—concluding that the "most recent" and "more specific" statute "controls." *Id.* at 949.

Our case, of course, is all-the-more compelling. While the SAA generally waives sovereign immunity for admiralty claims, the OPA doesn't. In enacting a *comprehensive* framework for oil-spill-cleanup liability, the OPA not only has no explicit waiver of sovereign immunity. It also eliminated a complete defense to liability premised on governmental negligence, and it defined "person"—in stark contrast to similar statutes like CERCLA—as including just about every governmental entity one could think of *other than* the federal government. In this way, our position is even stronger than it was in *Tug-Allie-B*, where we were left only with "silence" on the part of Congress. As in that case, then, the OPA—the statute that's both more specific and more recent—controls.

found that this more-general rule was preempted by a 1999 Medicaid amendment, which "expressly provide[d] that 'a State may use amounts recovered or paid to the State' under the [settlement agreement] 'for any expenditures determined appropriate by the State.'" *Id.* at 730 (quoting 42 U.S.C. § 1396b(d)(3)(B)(ii)).

In doing so, the Fourth Circuit concluded that the repeal-by-implication doctrine was inapposite. It distinguished run-of-the-mill implied-repeal decisions by observing that those "cases involve[d] repeals of *entire* statutes or rules." *Id.* at 733 (emphasis added). "By contrast, the effect of the 1999 amendment is highly specific. The amendment does not repeal the general operation of § 1396k(b)." *Id.* In fact, "[e]very Medicaid recipient—except those seeking tobacco money from the states—has the same rights under § 1396k(b) after the 1999 amendment as he or she had before it." *Id.* "Rather than repeal by implication a general statute (§ 1396k(b)), the 1999 amendment simply created a specific, discrete exception to that statute." *Id.* Our case is on all fours. The OPA is "highly specific." And every maritime plaintiff—except for an oil spiller—"has the same rights" after the OPA as it did before. Rather than repeal by implication the (general) SAA, the (specific) OPA simply created a discrete exception to it. As in *Strawser*, then, the repeal-by-implication doctrine is sort of beside the point.

★★★

Through the OPA, Congress struck a balance between the obligations of oil-vessel owners and the rights those owners might have to seek reimbursement for their oil-removal costs. Whether

50                    Opinion of the Court                    21-10745

that balance was the right one, it isn't for us to say. After careful review, we **AFFIRM**.